675 P.2d 673

**STATE of Arizona, Appellee,**

v.

**Jonathan L. HAAS, Appellant.**

**No. 5700–PR.**

Supreme Court of Arizona,
En Banc.

Oct. 31, 1983.

Reconsideration Denied Jan. 17, 1984.

Robert K. Corbin, Atty. Gen. by William J. Schafer III, Jack Roberts, Asst. Attys. Gen., Phoenix, for appellee.

Ross P. Lee, Maricopa County Public Defender and John Foreman, Phoenix, for appellant.

FELDMAN, Justice.

A jury convicted Haas (defendant) of five counts of fraudulent scheme and artifice, a violation of A.R.S. § 13–320.01. The imposition of sentence was suspended; defendant was placed on probation for ten years and ordered to make restitution by paying $27,500 in monthly payments of $230. By memorandum decision, the court of appeals reversed the convictions. (No. 1 CA–CR 4624, filed March 30, 1982.) We granted the State's petition for review. We affirm the convictions.

A complete statement of the facts will be set out in connection with our analysis of the legal issues raised by the defendant. The basic nature of the scheme which the State alleges is that Haas, a real estate agent and later a broker, was employed by two related corporations (State Investment and Valley Investment) to act on their behalf in the purchase of a large number of low-income, residential properties. There was a third corporation, Sigma Development and Trust (Sigma), related to State and Valley, but, at first, Haas did not know of its existence. Haas acted as an agent or broker for State and Valley over a period of several years. The method of operation was that Haas would consult listing books circulated in the real estate profession to locate properties which he thought would be of interest to Richard Rowe, the president of all three corporations. He would then submit these properties to Rowe or the vice-president, Peterson, and when directed by either of them, would draw offers in which State or Valley were listed as the buyer. Defendant then mailed the offer to the agent or broker who had taken

the listing and who represented the seller. The offers were fairly uniform in nature; the earnest money was minimal, the down payment to be made on closing was low and the majority of the purchase price was to be paid in installments.

While the deferred balance of the purchase price on the sale of real estate is customarily secured by mortgage or other security device giving the seller a lien on the property being sold, the offers prepared by defendant did not specifically provide for such security. Instead, they provided that the deferred balance was to be secured by a "money assignment," and "agreement assignment" or a "trust deed beneficial interest." None of these terms had any specific meaning and none were commonly used in the real estate business. Although the terms used in the offers resembled the terms for commonly used security devices which do provide the sellers with liens upon the property being sold, defendant's use of the terms was quite the opposite. The "money assignments" consisted of an assignment from buyer to seller of the buyer's interest in unsecured promissory notes made by Sigma or its employees to the buyer. The notes were sham and did not represent a valid indebtedness since the payor (usually Sigma) had never received any consideration from State or Valley for the execution of the note. The "agreement assignments" were similar and represented the buyer's assignment to seller of an agreement which Sigma had purportedly made to pay funds to the buyer. These agreements were also sham. The "trust deed beneficial interest" consisted of the assignment to the seller of buyer's "beneficial interest" in some other property which was neither identified nor mentioned in the offer. These "beneficial interests" were either sham or, in some cases, represented fourth or fifth mortgages on other properties and were uniformly without value.

Thus, by paying only the small down payments, the buyer closed escrow on each of the transactions and obtained title free of any lien to the seller. State or Valley obtained the money for the down payment by borrowing against the very property which it was acquiring or on properties previously acquired. It was able to do this because the sellers failed to reserve a lien to secure payment of the deferred purchase price. The funds borrowed on each property in excess of the down payment, costs and commissions [1] were used to pay corporate expenses and make monthly payments due on properties previously acquired. Of course, as more properties were acquired, more payments had to be made. Since the corporations were all under-capitalized, or not capitalized at all, funds for the ever-increasing amount of payments had to be obtained by buying more properties to use as collateral for borrowing more money.

As with most such schemes, the house of cards eventually fell and the buyers began to default on the monthly payments. As defaults occurred, the sellers and their agents and brokers found, to their surprise, that the sellers had no lien or other security upon the property sold, but, instead, had only worthless assignments or security devices upon which there was no possibility of ever realizing any recovery.

Haas was indicted, along with Rowe and Patterson, on 67 counts of securities fraud, sale of unregistered securities, failing to register as a dealer in securities, fraudulent scheme and conspiracy to commit the various crimes. Rowe died before trial. Patterson entered a plea of no contest to a conspiracy charge, and Haas stood trial. The State dismissed various counts, and the trial court granted judgments of acquittal on others. One count of conspiracy (to commit the crime of fraudulent scheme) and seven counts of fraudulent scheme were submitted to the jury. The jury acquitted Haas of the conspiracy charge and two of the counts of fraudulent scheme. It convicted him of five counts of fraudulent scheme, all of them on transactions which

---

1. As a "cooperating broker," defendant shared in the commissions. He usually received 50% of the sales commission, which was usually 7% of the sales price.

had their inception subsequent to November 1976.

Defendant does not deny the basic outlines of the transactions, nor does he really argue the existence of a fraudulent scheme. He does argue, instead, his knowledge, participation and culpability under the statute as it existed at the time of the offenses that were charged.

## SUFFICIENCY OF THE EVIDENCE

### *Elements of the Crime*

Defendant first claims that the evidence admitted at trial was insufficient to sustain a conviction under A.R.S. § 13–320.01.[2] The statute provides, in part:

> Any person who, pursuant to a scheme or artifice to defraud, knowingly and intentionally obtains or attempts to obtain money, property or any other thing of value by means of false or fraudulent pretenses, representations or promises is guilty of a felony ....

This statute was adapted from the federal mail fraud statute, 18 U.S.C. § 1341. *See State v. Moses,* 123 Ariz. 296, 599 P.2d 252 (App.1979). The federal statute provides:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises ... for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service ... shall be fined not more than $1,000 or imprisoned not more than five years, or both.

■ It is a general rule that a statute "adopted from another state will be presumed to have been adopted with the construction previously placed upon it by the courts of that state, and their decisions construing the statute will be construed as persuasive." *Mileham v. Arizona Board of Pardons and Paroles,* 110 Ariz. 470, 473, 520 P.2d 840, 843 (1974). This same rule applies to a federal statute adopted in Arizona. *Arizona Civil Rights Division v. Olson,* 132 Ariz. 20, 25–26, 643 P.2d 723, 728–29 (App.1982).

■ The federal mail fraud statute encompasses a broad range of fraudulent activities. Both the federal and state statutes proscribe a "scheme or artifice to defraud." This element is not defined according to any technical standard. *United States v. Pearlstein,* 576 F.2d 531, 535 (3d Cir.1978). The scheme need not be fraudulent on its face but "must involve some sort of fraudulent misrepresentations *or omissions* reasonably calculated to deceive persons of ordinary prudence and comprehension." *Id.* (emphasis supplied); *United States v. Netterville,* 553 F.2d 903, 909 (5th Cir.1977), *cert. denied,* 434 U.S. 1009, 98 S.Ct. 719, 54 L.Ed.2d 752 (1978); *United States v. Bruce,* 488 F.2d 1224, 1229 (5th Cir.1973), *cert. denied,* 419 U.S. 825, 95 S.Ct. 41, 42 L.Ed.2d 48 (1974). The statute requires proof of the specific intent to defraud. *Pearlstein,* 576 F.2d at 537; *United States v. Payne,* 474 F.2d 603, 604 (9th Cir.1973). The intent to defraud can be established by proving the defendant devised the fraudulent scheme or wilfully participated in it with knowledge of its fraudulent nature. *Pearlstein,* 576 F.2d at 537–38. "Fraudulent representations," as that term appears in § 1341, may be effected by deceitful statements or half-truths or even the concealment of material facts. *United States v. Goldstein,* 695 F.2d 1228, 1233 (10th Cir.1981), *cert. denied,* —— U.S. ——, 103 S.Ct. 3112, 77 L.Ed.2d 1367 (1983); *United States v. Allen,* 554 F.2d 398, 410–11 (10th Cir.), *cert. denied,* 434 U.S. 836, 98 S.Ct. 124, 54 L.Ed.2d 97 (1977); *United States v. Curtis,* 537 F.2d 1091, 1097 (10th Cir.), *cert. denied,* 429 U.S. 962, 97 S.Ct. 389, 50 L.Ed.2d 330 (1976); *Williams v. U.S.,* 368 F.2d 972, 975 (10th Cir. 1966).

**2.** A.R.S. § 13–320.01 was adopted in 1976 and became effective June 27, 1976. It was amended effective October 1, 1980 and renumbered § 13–2310.

Defendant argues with some force that there is a distinct difference between the federal statute and the Arizona version of that statute. The federal statute proscribes schemes or artifices to defraud *"or"* for obtaining money or property by means of false or fraudulent pretenses, representations or promises. The Arizona statute does not use the disjunctive and does insert specific requirements of "knowingly and intentionally." Thus, defendant argues, in Arizona the state must prove not only (1) a scheme or artifice to defraud, but also that (2) defendant knowingly and intentionally participated in it and that (3) it was a scheme for obtaining money or property by means of "false or fraudulent pretenses, representations or promises." We agree and examine the evidence from that perspective. In determining whether there was sufficient evidence to support defendant's convictions, however, "this Court will not engage in reweighing the evidence." *State v. Tison,* 129 Ariz. 546, 552, 633 P.2d 355, 361 (1981), *cert. denied,* 459 U.S. 882, 103 S.Ct. 180, 74 L.Ed.2d 147 (1982). "It will be viewed in the light most favorable to sustaining the conviction and all reasonable inferences will be resolved against a defendant." *Id.* The test is whether there was sufficient evidence that a rational trier of fact could have found the defendant guilty beyond a reasonable doubt. *Id.*

### *"Knowingly and Intentionally"*

We believe the facts outlined above support the jury's presumptive finding that a scheme to defraud existed.[3] Defendant does not argue the contrary. Therefore, we must first consider whether the evidence supports a finding that the defendant wilfully and knowingly participated in the scheme.

Defendant cites *United States v. Pearlstein, supra,* as support for his argument that he did not violate the Arizona statute. In *Pearlstein,* the Third Circuit held that there was insufficient evidence produced at trial to prove certain salesmen knew of the organization's fraudulent purpose and intentionally acted to further it. The State points out the differences between the facts in *Pearlstein* and the facts in the case at bench. In *Pearlstein,* none of the salesmen worked for the company more than a few months. There was no proof the salesmen knew that promotional materials prepared by the promoters were false. In fact, the salesmen were not allowed to see company files or read correspondence. As a result, there was no logical basis from which to draw an inference of specific intent concerning what the salesmen could have known about the promotion. Absent proof of their knowledge of the falsity of the scheme, it was improper to infer specific intent merely because salesmen participated. We agree, but think this principle inapposite to the facts before us.

In the case at bench, the evidence showed that defendant inserted the vague wording used in the purchase agreements to describe the "security" for the deferred balance of the purchase price.[4] Defendant was aware that the language used to describe the security devices did not reserve a lien in favor of the seller on the property being conveyed. Defendant concedes that he was aware that the sellers would probably not have realized that this was the case. Defendant had taught at real estate schools and was aware that the brokers

---

3. The outlines of the scheme resemble a modification of the now famous "Ponzi" scheme. This designation is derived from "the remarkable criminal financial career of Charles Ponzi." *Cunningham v. Brown,* 265 U.S. 1, 7, 44 S.Ct. 424, 425, 68 L.Ed. 873 (1924). See also *United States v. Cook,* 573 F.2d 281, 282 n. 3 (5th Cir.), *cert. denied,* 439 U.S. 836, 99 S.Ct. 119, 58 L.Ed.2d 132 (1978). The course of conduct pursued by State, Valley and Sigma is analogous to a "variation of the 'Ponzi' scheme," *Carpenter v. Harris, Upham & Co., Inc.,* 594 F.2d 388, 391

(4th Cir.), *cert. denied,* 444 U.S. 868, 100 S.Ct. 143, 62 L.Ed.2d 93 (1979), in which "[n]ew investor money was used to pay off existing investor contracts which had become due...." *Id.*

4. Defendant claims that the exact wording of these terms was supplied by Rowe or Patterson, but defendant concedes inserting the wording in hundreds of offers which he prepared and mailed to agents for sellers.

and agents who attended and graduated from those schools were not taught the meaning of the terms he used. In fact, most of the sellers' agents who testified at the trial had not appreciated the meaning of the phrases used in the offers. From this, and the fact that the terms are not commonly used and have no specific meaning, the jury could have inferred that defendant was aware of the probability that the agents or brokers representing the sellers might not realize that no lien was reserved on the property being conveyed and would assume that, as customary, the seller had retained a security interest in the property. Of the five transactions of which defendant was found guilty, it appears that in only one was the agent for the seller aware that there would be no lien reserved on the property being sold. The jury could have inferred that at some time in the hundreds of transactions which he handled, defendant was aware that the language he had used in the purchase offers prepared by him was misleading many, if not most, of the sellers and causing them to convey their property free of a security interest.

Thus, the jury could easily have concluded that even if defendant had no actual knowledge of the fraud, he was aware of the high probability that the scheme was fraudulent and deliberately shut his eyes to avoid learning the truth. Such a conclusion justifies the ultimate inference of knowing participation. *United States v. McDonald*, 576 F.2d 1350, 1360 n. 17 (9th Cir.1978). A case quite similar to the case at bench held that the fact that few of the purchasers in a transaction understood the legal meaning of the papers (purported sales agreements which contained provisions creating promissory notes and mortgages waiving Louisiana homestead rights) supported the jury's presumptive finding that representations made were designed to delude the purchasers regarding the true nature of the transaction. *Blachly v. United States*, 380 F.2d 665, 673–74 (5th Cir.1967).

Defendant's knowledge that the scheme promoted by Rowe and Patterson was fraudulent was also supported by testimony indicating that defendant was in constant and frequent touch with Patterson and that defendant often inspected the properties with Patterson and Rowe. Patterson testified that in 1975, he and defendant had a conversation in which, supposedly in jest, the defendant asked him how the "Ponzi" game was coming. The testimony of the escrow officer at the title company involved indicated that defendant was told that the earnest money checks presented by State and Valley were being drawn on closed accounts and could not be accepted, that funds necessary for closing were obtained from mortgages or trust deeds placed upon the property being acquired and were then transferred into the escrow file on the purchase in order to provide the necessary funds to close the purchases. Further, defendant was told that the title company would no longer open escrows where the purchase agreement indicated that a "money assignment" was provided. Upon learning this, defendant used the term "agreement assignment" or "trust deed beneficial interest" in the agreements. Although he knew the identification of the so-called security devices was material and important to the transaction, none of the offers submitted by defendant contained any precise identification of just what was being given the seller as security. Defendant admitted that on at least some of the transactions he was aware that the collateral being assigned and described as "trust deed beneficial interest" was subject to prior claims.

Defendant dictated the escrow instructions to the title company which acted as escrow agent on each of the transactions. Those escrow instructions were as vague as the purchase offers in describing the device which was to secure the deferred balance. They referred only to money assignments, agreement assignments or trust deed beneficial interests. They did not describe what was being assigned, who was the debtor and who the obligee, nor give any identification of what was being "assigned" or given as security. Thus, even

at closing, the seller was given no information which would have alerted him to the real nature of the transaction—that no lien was reserved on the property being sold. From these facts, the jury would have been justified in inferring that defendant was intentionally withholding or concealing information that would have revealed the true nature of the transaction.

Other circumstances provide further corroboration for the inference that the defendant knowingly and intentionally participated in the scheme *after* he became aware of its fraudulent nature. Prior to November of 1976, defendant was aware of defaults by the buying corporations. While defendant at first denied any knowledge of the third corporation, Sigma, he admitted on the witness stand that he must have known of it as early as November 1976, one month prior to the first of the transactions with which defendant was charged in the case at bench. This belies his previous assertions that he knew nothing of the dealings among the three corporations. Defendant admitted that he knew in November of 1976 that the sellers were receiving only unsecured collection accounts to secure the deferred purchase price. Defendant admitted that he did not disclose this information to sellers unless he was asked, despite his knowledge that the pertinent language used in the offer was highly unusual and was neither clear nor explicit.

There were also two instances of express misstatement of fact. In the first of these, the defendant told an agent for one of the sellers that Valley and State "were good because he had dealt with them for quite a long time and [they] kept up their payments." In the second, and more important, defendant assured another agent that the "beneficial interest" named as security "was ample." These representations were made at times after the facts establish that beyond doubt defendant was well aware

that the corporations were defaulting on monthly payments [5] and knew that the security given the various sellers was neither "ample" nor real. Even if, as defendant claims, he had no knowledge of just what security device would be given the seller,[6] the jury could have found that defendant's representation that the security "was ample" was at best made with reckless indifference to truth.

■ From all of the foregoing, we believe there was sufficient evidence to permit the jury to conclude that defendant was aware of the fraudulent nature of the "scheme or artifice to defraud" and that he intentionally participated in it. After admitting to having taken part in hundreds of transactions, defendant was unable to convince the jury that at the time of the offenses charged he was still unaware of the real nature of the enterprise in which he was participating. While the defendant claimed that he did not realize what was being done by Rowe and Patterson and proclaimed his ignorance of the fraud and his good intentions, the jury may well have adverted to the biblical advice:

> Beware of the scribes, which love to go in long clothing, and love salutations in the marketplaces, and the chief seats in the synagogues, ... [and who] devour widows' houses and for a pretense make long prayers.

Mark 12:38–40 (King James). The essence of the determination of the issue of whether defendant acted knowingly and intentionally was a judgment of his credibility. *United States v. Goldstein*, 695 F.2d at 1234–35. On this record, we must defer to the jury verdict on that determination.

### False or Fraudulent Pretenses, Representations or Promises

Defendant argues that he made no explicitly false statements and that, if asked,

---

**5.** Defendant claims that he was told that the defaults in monthly payments were made good, but the record establishes that he was aware that the corporations all had "cash flow problems."

**6.** Although the agreements and escrow instructions spoke about money assignments, agreement assignments and the like, the exact nature or identity of these was not specified in the papers, and evidently would not be provided the sellers until after closing.

he told the prospective sellers or their agents the true outlines of the transactions. Thus, he contends, at the most he is guilty of omissions or concealments. Since the statute does not mention those derelictions, defendant claims that the evidence is insufficient to convict.

■ The court of appeals reversed this case because it agreed with defendant's argument that an "active misrepresentation" was an essential element of § 13–320.01 and that concealment or omission of a material fact was not sufficient to violate the statute. The court based this conclusion on two grounds. First, the statute covering fraudulent schemes relating to a public body (§ 13–320.02) was enacted at the same time as § 13–320.01 and expressly provided that wilfull concealment of a material fact was an element of the crime. Because this language was absent from § 13–320.01, the court concluded that the legislature clearly intended that concealment of a material fact could constitute a fraudulent representation only in dealings with a public body. We cannot agree with this analysis. In our view, when the legislature adopted A.R.S. § 13–320.01 from the federal statute, it also intended to adopt the prior interpretations of the federal act. These established that fraudulent representations can be made by concealment and statements of half-truths. See p. 678, *ante*.

The second ground asserted by the court of appeals was that when the Arizona Criminal Code was revised in 1978, the fraudulent scheme and artifice statute (presently renumbered § 13–2310) was amended to include material omissions as an element. The court believed this amendment mandated the conclusion that the statute did not previously encompass material omissions. We also disagree with this analysis. Since decisional law had interpreted false representations broadly enough to include material omissions, we think it equally likely that in revising the statute the legislature was simply articulating the interpretation given the statute by prior judicial decision.

Further, we can conceive of no reason why the legislature would intend to limit the scope of the fraud statute to "active" misrepresentations. In view of the federal precedents and in the absence of any legislative history to the contrary, we think it legitimate to assume that the legislature intended a broad proscription of fraud and not merely fraud by "active misrepresentation." We think this a logical conclusion, in harmony with the original concept that when the statute became law in 1976 it was, from the beginning, thought to be a law which "encompasses a very broad range of fraudulent activities." *State v. Moses*, 123 Ariz. at 298, 599 P.2d at 254.

Finally, we note that the statute not only proscribes fraudulent "misrepresentations," but also "false or fraudulent pretenses." Synonyms for "pretense" include "disguise," "dissimulation," "ruse," "subterfuge," and "trick." "Misrepresentation" is not listed as a synonym. Funk & Wagnall's Standard Handbook of Synonyms, Antonyms and Prepositions (Fernald, 1947). "A *pretense* ... is something advanced or displayed for the purpose of concealing the reality." *Id.* "A *trick* is a device to gain an advantage by deception." *Id.* "A *subterfuge* is resorted to in order to conceal...." *Id.* Among the definitions for "pretense" offered in Webster's Third International Dictionary is "deception by showing what is unreal and concealing what is real." We believe that the plain, ordinary meaning of "fraudulent pretense" encompasses intentional misleading by hiding or concealing the truth. These concepts are particularly applicable to defendant's conduct in the case at bench. Defendant knew, but the sellers did not, that the vague language used in the offers would result in the seller having no lien on the property being conveyed to secure the deferred balance of the purchase price. Defendant knew, but the sellers did not, that the security which was mentioned in the sales agreements might be worthless or illusory. What appeared to be a "good deal" for the sellers was no more than a trap for the unwary.

 The court of appeals held that the word "pretense" added nothing to the statute. The court based this conclusion on the premise that in *State v. Edgar*, 126 Ariz. 206, 208, 613 P.2d 1262, 1264 (1980), we interpreted the word "pretense" in the context of former A.R.S. § 13–101, et seq. (obtaining property by false pretenses) as requiring "a misrepresentation of a past or existing fact...." This is true, but the case was neither concerned with nor holds that the terms "pretense" and "misrepresentation" are synonymous in all cases. In fact, they are not. See Funk & Wagnall, *supra;* Webster, *supra.* More importantly, as stated in *State v. Moses*, 123 Ariz. at 297, 599 P.2d at 253, the statute under which defendant was charged (A.R.S. § 13–320.01) is not a codification of the common law crime of false pretenses. It was an adoption of the federal mail fraud statute (18 U.S.C. §§ 1341–1343). That statute, and ours, were intended to encompass a much broader range of fraudulent activities than the common law crime of false pretenses.

The court of appeals also concluded that since the new statute codifying the common law crime of theft by false pretenses (A.R.S. § 13–1802(A)(3)) omits the term "pretense," this suggests "that its use in the former criminal code was redundant." We disagree with this analysis also. The new fraudulent scheme statute (A.R.S. § 13–2310) still uses both phrases in the disjunctive ("fraudulent *pretenses, representations or* promises ...."), thus indicating that the legislature does not find the word "pretense" redundant or synonymous with the word "representations" in a fraud statute.

 In the final analysis, therefore, we conclude that the court of appeals erred in holding that "active misrepresentation is an essential element of a violation of A.R.S. § 13–320.01." We hold, instead, that a defendant may be found guilty of knowingly and intentionally participating in a scheme or artifice to defraud "by means of" either "fraudulent pretenses" or "fraudulent representations" when that defendant has knowingly led the adverse party to believe a state of facts which is not true and when this has been accomplished either by active misrepresentations, or omitting material facts which defendant knew were being misunderstood, or by stating half-truths, or by any combination of these methods. See p. 678, *ante.* We believe that there was support for a presumptive jury finding that the defendant did just that.

### Fraudulent Nature of Defendant's Participation

 Defendant next claims that although there may have been a scheme, his participation was not "fraudulent." He bases this argument on the hypothesis that he was representing the buyers in arms-length transactions with various sellers who were also represented by real estate brokers or agents. Defendant contends that the language used in the agreements did not specifically promise that a lien would be retained upon the property to be conveyed and that each of the sellers relied on the advice of their own real estate person. Thus, defendant concludes that he perpetrated no fraud upon any of the sellers. They were left free to reach their own conclusions with regard to the legal meaning of the terms contained in the offers and to accept or reject those offers as they liked. They were also free, defendant points out, to ask any questions they liked, and when questions were asked with regard to meaning of the terms, defendant answered such questions truthfully by stating that there would be no lien upon the property to be sold. As a result, defendant urges, there was no fraudulent scheme or artifice. We disagree. A "scheme" is a "plan," while an "artifice" is an "evil or artful strategy." Thus, a "scheme or artifice" is some "plan, device, or trick" to perpetrate a fraud. *State v. Stewart*, 118 Ariz. 281, 576 P.2d 140 (App.1978). Something is fraudulent when it is "reasonably calculated to *deceive* persons of ordinary prudence and comprehension." *United States v. Netterville*, 553 F.2d at 909, quoting from *United States v. Bruce*, 488 F.2d at 1229. As discussed above, the jury easi-

ly could have found that almost all of the sellers and many of the agents who represented the sellers would be misled by the language employed in the agreements and could also have inferred that defendant was aware of this before the five transactions of which he was convicted.

■ The · "fraudulent aspect of the scheme to 'defraud' is measured by a non-technical standard." *Blachly v. United States*, 380 F.2d at 671. The statute proscribes conduct lacking in "fundamental honesty [and] fair play ... in the general and business life of members of society." *Id.* In the final analysis, we adopt a broad view of the statute because no other view is sensible. The definition of "fraud" must be broad enough to cover all of the varieties made possible by boundless human ingenuity.

## INSTRUCTIONS

The defendant argues that the trial court made several errors in instructing the jury. First, defense counsel claims the trial court erred in refusing to instruct the jury that defendant, as a cooperating broker, was not an agent of the seller and had no duty to inform the sellers that they did not retain a security interest in their property. Defendant relied on the decision in *Buffington v. Haas*, 124 Ariz. 36, 38, 601 P.2d 1320, 1322 (1979), which held that he was not an agent of the seller and therefore had no duty to inform the seller of the terms of the contract. The court of appeals felt that this civil principle applied in the criminal context and held that the trial court's refusal to give the instruction was error. We cannot agree.

■ The civil action in *Buffington v. Haas, supra,* was premised on defendant's alleged breach of his fiduciary duty as an agent of the seller. On the basis of a single transaction, this court held that because no agency relationship existed, defendant had no duty to inform the seller and was not civilly liable for the seller's losses. Criminal liability under § 13–320.-01, however, is not premised on the existence of an agency relationship. The state's

proof of the requisite elements under this statute would permit a conviction regardless of whether defendant was subject to civil liability for the same acts under an agency theory. There was no error in refusing this instruction.

Next, defendant claims, and the court of appeals held, that the trial court erred in charging, over defense objection, that a "fraudulent representation may be made by statements of half-truths or by concealment of material facts...." As indicated above, we disagree. An "active" misrepresentation need not be shown. There is a misrepresentation whenever the combination of what is said, what is half-said and what is not said results in misrepresenting the nature of the transaction. We believe the instruction in question was a proper statement of the law.

Next, the defendant objected to the instruction on scienter:

A statement or representation is false or fraudulent within the meaning of the statute if known to be untrue or made with reckless indifference as to its truth or falsity *and* made or caused to be made with the intent to deceive.

(Emphasis supplied.)

■ Defendant claims this instruction applies a negligence standard and was confusing. The court of appeals agreed with the defendant and held that the trial court erred in so instructing the jury. We find no error. The instruction does not apply a negligence standard, but only defines fraudulent representation. The instruction clearly requires that the statement be made with the intent to deceive. Contrary to defendant's argument, knowledge of the actual falsity of any particular representation made to promote the scheme is not required to convict. *Provided the intent is to deceive*, it is immaterial whether the individual knew the representation was false or simply did not care and was indifferent to the truth. *See United States v. Themy*, 624 F.2d 963, 965 (10th Cir.1980); *United States v. Lamont*, 565 F.2d 212, 227–28 (2d Cir.1977), *cert. denied,*

435 U.S. 914, 98 S.Ct. 1467, 55 L.Ed.2d 505 (1978); *United States v. Serlin,* 538 F.2d 737, 748 (7th Cir.1976). Defendant may not escape the sanction of the law by simply closing his eyes and then professing innocence through ignorance.

■ Defendant next claims that the instructions on the accomplice theory contradicted each other because one required that an accomplice knowingly aid and abet, while the other required only that the accomplice wilfully and intentionally joined in the scheme. We find this contention without merit. The instructions were complementary rather than contradictory.

■ Finally, defendant argues that one of the instructions was improper because it did not require a finding that the defendant had knowledge of the illegal scheme. Jury instructions must be considered as a whole. *State v. Richardson,* 110 Ariz. 48, 50, 514 P.2d 1236, 1238 (1973). A case will ordinarily not be reversed because some isolated portion of an instruction, standing alone, might be misleading. *State v. Norgard,* 103 Ariz. 381, 383, 442 P.2d 544, 546 (1968). Even if the particular instruction was misleading, the trial court repeatedly advised the jury that to convict it must find both that defendant had knowledge of the fraudulent scheme and acted with the intent to deceive in furtherance of the scheme. There was no error.

### MOTION TO SEVER

Counsel for a codefendant, Fred Patterson, made a motion prior to trial to sever the counts involving unregistered securities, A.R.S. § 44–1841, and securities sold by unlicensed dealers, § 44–1842, from the counts charging fraudulent scheme to sell unregistered securities, § 44–1991 and the counts charging fraudulent scheme or artifice, § 13–320.01. Trial counsel for defendant joined in this motion, which the trial court denied. At the close of the evidence, the trial court directed a judgment of acquittal on all the securities charges. The motion to sever was not renewed during trial or at the close of the evidence. On appeal, defendant claims he was prejudiced by the trial court's failure to grant the motion to sever.

Ariz.R.Crim.P. 13.4(c), 17A A.R.S. provides:

A defendant's motion to sever offenses or defendants must be made prior to trial and, if denied, renewed during trial at or before the close of the evidence.... *Severance is waived if a proper motion is not timely made and renewed.*

(Emphasis supplied.)

■ Since the defendant did not renew the motion to sever offenses, it was waived. *State v. Bruni,* 129 Ariz. 312, 316, 630 P.2d 1044, 1048 (App.1981). Even if not waived, the joinder was proper under Ariz.R.Crim.P. 13.3(a), because the indictments were part of a common scheme or plan. *State v. Jones,* 120 Ariz. 556, 558, 587 P.2d 742, 744 (1978); *State v. Bruni, supra.* There was no error in denying the motion to sever.

### GRAND JURY PROCEEDINGS

The defendant claims the trial court erred in failing to grant his motion for a redetermination of probable cause. Defendant asserts that through the testimony of two witnesses the prosecutor fraudulently misrepresented the evidence and the law in order to prejudice the grand jury against him. The grand jury proceedings covered three days of testimony. The court has read the transcripts of the proceedings and we find the defendant's assertions of prosecutorial misconduct groundless.

■ The first witness' testimony was accurate and any objection made by the defendant is without merit. The second witness read portions of the Code of Ethics of the National Association of Realtors and stated that Arizona law requires salespersons and brokers to subscribe to that code. Defendant claims this was a misstatement of the law and the prosecutor elicited this legal conclusion in order to prejudice the grand jury against him. First, the prosecutor did not elicit the statement in question. The questionable portion of the answer was

non-responsive to the prosecutor's question. Second, we do not believe this statement harmed the defendant in any way. The witness did not state that it was a crime to violate this code of ethics. Further, the prosecutor made it clear under which statutes the defendant was being charged. Finally, defendant himself appeared before the grand jury and stated that he did not belong to the National Association of Realtors and was therefore not bound by the standards set by that organization but only by the rules promulgated by Arizona's Real Estate Commissioner.

The jury, after a full trial, convicted defendant of five counts of violations of A.R.S. § 13–320.01. Any misstatement at the grand jury proceedings concerning a violation of a code of ethics had no effect on the subsequent trial. *See State v. Verive,* 128 Ariz. 570, 575, 627 P.2d 721, 727 (App.1981) (defendant cannot, by appeal from a conviction, obtain review of matters relevant only to the grand jury proceedings that had no effect on subsequent trial); *State v. Neese,* 126 Ariz. 499, 502–03, 616 P.2d 959, 962–63 (App.1980).

INDICTMENT BY GRAND JURY

■ Defendant's final issue concerns the trial court's failure to allow the defendant to have a preliminary hearing after the grand jury indictment had been returned. In *State v. Bojorquez,* 111 Ariz. 549, 553, 535 P.2d 6, 10 (1975), this court stated:

> While the appellant attempts to point up the disadvantages of the grand jury system, as compared to the information route, the indictment method by a grand jury is recognized as a fundamental element of the accusatory process under the United States and Arizona Constitutions. U.S. Const. amend. V; Ariz. Const. art. 2, § 30. Either method—indictment by grand jury or information after preliminary hearing—is constitutionally proper.

We recently reaffirmed this principle against constitutional attack in *State v. Sisneros and Dominguez,* 137 Ariz. 327, 670 P.2d 721 (1983). The trial court did not err in refusing to grant defendant's request for a preliminary hearing after an indictment had been returned.

We have reviewed the record for fundamental error pursuant to A.R.S. § 13–4035 and find none.

Accordingly, the decision of the court of appeals is vacated and the judgments of conviction and the sentences imposed are affirmed.

HOLOHAN, C.J., GORDON, V.C.J., and HAYS and CAMERON, JJ., concur.