49 B.R. 254 (1985)
In re Albert W. NASH and Joyce H. Nash; and Albert W. Nash, a Trustee for the A.W. Nash Family Trust, Debtors.
PALO VERDE MANAGEMENT AND FINANCIAL SERVICES CO., an Arizona corporation, Movant,
v.
Albert W. NASH, aka A.W. Nash; Joyce H. Nash; Albert W. Nash, as Trustee for the A.W. Nash Family Trust; Robert Busch, Trustee in Bankruptcy, Respondents,
and
Mary L. Ward, secured creditor, Intervenor.
In re WARE PROPERTIES, INC., Debtor.
PALO VERDE MANAGEMENT AND FINANCIAL SERVICES CO., an Arizona corporation, Movant,
v.
WARE PROPERTIES, INC. and Robert Busch, Trustee in Bankruptcy, Respondents,
and
Mary L. Ward, secured creditor, Intervenor.
Bankruptcy Nos. B-83-2590-PHX-GBN, B-83-2591-PHX-GBN.
United States Bankruptcy Court, D. Arizona.
May 14, 1985.
*255 Norman D. James, Ryley, Carlock & Applewhite, Phoenix, Ariz., for intervenor.
*256 Robert S. Porter, Ellis, Baker, Lynch, Clarke & Porter, P.C., Phoenix, Ariz., for movant.
Albert W. and Joyce H. Nash, Phoenix, Ariz., Jon N. Vogel, Scottsdale, Ariz., for trustee.
GEORGE B. NIELSEN, Jr., Bankruptcy Judge.
This litigation concerns a challenge by a junior creditor to a request by a senior lien claimant to foreclose its security. Since the affirmative defenses contest the validity of the senior lien, the junior creditor has been allowed to intervene to press its case in this Court. In re Davenport, 34 B.R. 463, 466 (Bankr.M.D.Fla.1983). However, because intervenor has failed to carry her burden of proof, a finding for the senior creditor has previously been issued. The purpose of this memorandum is to express the findings and conclusions supporting the prior ruling. Rule 7052, F.Bk.R.

I.
The controversy arises from a request by Palo Verde Management and Financial Services Co. ("movant") for relief from the automatic stay in regard to a Phoenix, Arizona residence. 11 U.S.C. § 362(d); Rule 4001, F.Bk.R.
The home was previously owned by Chapter 7 debtor Ware Properties, Inc. ("Ware"). Corporate debtor's sole officers, directors and shareholders are Albert W. and Joyce H. Nash ("Nash"), who are debtors in a separate Chapter 7 administration. Mr. and Mrs. Nash briefly held an interest in the home themselves. Accordingly, the stay lift request was directed at both the corporate and individual debtors' rights in the property. Neither debtors nor their trustees opposed the motion. However, creditor Mary L. Ward, former owner and holder of a third position trust deed, appeared and objected. Creditor Ward was allowed to intervene, solely to raise any defenses available to debtors or the trustee. In re Fidelity America Mortgage Co., 15 B.R. 70, 72 (Bankr.E.D.Pa.1981); Rule 7024, F.Bk.R.
Specifically, she attacks the validity of the second trust deed securing Palo Verde's claim, originally placed on the realty by Ware.
Ms. Ward became the original owner of the home in 1971. It was placed on the market on July 12, 1982 through the assistance of real estate broker Susan Wood, now deceased. Ms. Ward and Albert Nash[1] signed a real estate purchase contract on July 16, 1982. Nash agreed to assume an existing first mortgage of $14,000, pay a series of deposits totalling $8,000 and provide a note of $14,170 for the balance of the $36,270 purchase price. Exhibit 4, at 1. The note and a trust deed securing it were signed by Nash on behalf of Ware Properties, Inc. in August of 1982. Exhibit 8. Ms. Ward's warranty deed of the premises to the corporation was acknowledged by a notary public on July 21, 1982 and recorded by escrow agent U.S. Life Title Company of Arizona on August 20. Supra.
The purchase contract provided buyer might wish to obtain a new loan on the premises "in an amount sufficient at least to return buyer's investment and costs. . . ." Exhibit 4, at Addendum A, ¶ 5. Ms. Ward expressly agreed such new loan could be recorded prior to her $14,170 trust deed. Supra. Appearing at the escrow company in July, 1982, she learned from escrow officer Judith L. Dersham that Nash had taken out an $18,500 loan on the property. Although concerned about this amount, creditor Ward signed an escrow amendment which relegated her lien to third position rather than terminate the sale. Exhibit 7, at 5. She was then given a check for $4,658.67. Prior to signing the amendment, Ms. Ward had discussed the matter with her own broker, Ms. Wood. She understood this provision allowed Nash to place a lien with higher priority on the premises. She further understood that foreclosure of such lien would emperil her *257 own interests. Payments under the Ware-Nash note commenced in March, 1983. Debtors defaulted after the August 1, 1983 payment. Creditor Ward now objects to the amount of the trust deed, of which movant is the assignee. Exhibit 11.
By close of escrow, Ms. Ward received $4,658.67 cash, was credited with three late payments of $153.00 each to first lienholder Utah Mortgage, along with a $20.48 late fee, previously received $1,000.00 directly from Nash as an advance,[2] had her Utah Mortgage obligation of $14,027.11 assumed and her broker's commission paid. Exhibit 7.
Debtor Albert Ware Nash, Jr., a retiree, established Ware Properties, Inc. to invest in real estate. Since 1981, Mr. and Mrs. Nash would commingle funds between their personal account and that of the corporation. From 1980 to 1982, debtors estimate assigning 25-30 collateralized notes to Palo Verde Management or other affiliated companies owned or controlled by Paul Schulman. Most notes involved dealings between Mr. and Mrs. Nash and their corporation. Debtors transacted with other investors besides Mr. Schulman, however. Palo Verde's procedure was to loan debtors 75% of the parcel's appraised value, less prior liens, in short terms with a balloon payment at the end. Interest was at the market rate. When Palo Verde would actually purchase a note, the price would be set by the discount rate in the secondary mortgage market for second trust deeds, less escrow costs and title fees.
Acting on the prior advice of a title and trust company, Mr. and Mrs. Nash would not seek a direct Palo Verde sale, but instead utilize Ware as an intervening third party to avoid Arizona's usury limits. This maneuvering, which ultimately led in part to Ms. Ward's challenge, was unnecessary. Well prior to this transaction, the state legislature removed the interest lid on consenual loan transactions. Cf. A.R.S. § 44-1201 A (1980), with § 44-1201 B (1956). Nash instituted this practice prior to his dealings with Schulman and Palo Verde.
Nash invested $3,000 into the Ward home, including a $1,400 fence and incurred escrow costs and a down payment of over $11,600, as well. Addendum A, containing the parties' subordination agreement, was prepared by escrow agent Dersham, not debtors. To establish the desired "third party" Nash, as part of his routine practice, prepared a trust deed and note from Ware Properties to Mr. and Mrs. Nash for $18,500, secured by the Ward home. Exhibit 11. Although Nash previously testified at a deposition that the consideration for the Ware-Nash transaction was a ledger entry, there is no record in that amount. By August 13, 1982, debtors' practice of commingling personal and corporate accounts was well advanced. The Ware Properties bookkeeper was Louise F. Authement, a Nash daughter, who tried "her darnest" to keep the accounts separate. She was unsuccessful.
A separate escrow was established by U.S. Life Title to effectuate transfer of the Nash interest in the Ward home to Palo Verde. Exhibit 10. At the time of the July, 1982 Ward real estate purchase contract, debtors had not contacted Palo Verde for financing. During this period, debtors were thus free to transact with other investors, and would have done so had Schulman refused the transaction. At this time, debtors owned some 45 houses. By an amendment to the Nash-Palo Verde escrow instructions, Nash directed U.S. Life Title to apply any funds necessary to close the Ward-Ware Properties escrow. Exhibit 10, at 3. This resulted in a transfer of $7,396 to that escrow. Escrow settlement sheet of August 20, 1982, Exhibit 10. The $8,593.50, disbursed to Mr. and Mrs. Nash from the Palo Verde escrow, was placed in the Ware corporate account.
Debtors used the "straw man" transactions between themselves and their corporation *258 to create notes for sale to other investors besides Schulman. There is a Ware Properties corporate resolution which purports to allow such dealings.
Debtors' ledger, "Houses for resale," reflects a credit of $8,593.50 on the Ward home, indicating this sum went to the corporation's savings account. Exhibit 2. Another entry reflects the $7,396 transferred to the Ward escrow. These figures do not fully account for the $18,500 "loan" between Mr. and Mrs. Nash and the corporation. Consequently, the ledger will not balance.
Escrow agent Dersham prepared the August 16, 1982 amendment to escrow instructions, which identifies the $18,500 prior lien placed on the home by Ware. Exhibit 7. This amendment, signed by Ms. Ward, was prepared on Ms. Dersham's own initiative. Although she knew Nash owned Ware Properties, she saw no reason to so identify them in the $18,500 prior lien referenced in the amendment. In regard to the Ware-Nash transaction, she had no recollection if the note, trust deed and assignment to Palo Verde were attached together, although she did notarize both the trust deed and the assignment on August 13, 1982. Exhibit 11. Such assignments were always on a separate document.
In handling the Ward escrow, Ms. Dersham has no recollection when Ms. Ward appeared to close the transaction, but does know she would not have arranged for the instruments' August 20, 1982 recordation until the amendment was signed. It would be office procedure for Ms. Ward to sign the amendment prior to recordation of the Palo Verde transaction. She has no control over the exact time the County Recorder processes instruments, however.
Mr. Schulman, as President of Palo Verde, dealt with debtors from 1979 to 1982, ultimately purchasing 30-35 Ware-Nash notes. Palo Verde did not inquire concerning the $18,500 debt between Nash and Ware Properties, although Schulman knew Mr. and Mrs. Nash were Ware's only officers. Neither did Palo Verde inquire concerning the purchase and subordination agreement between debtors and Ms. Ward. Palo Verde's criterion in all its dealings was that only one encumbrance be ahead of it, that the note be short term and bear market interest. Movant did obtain a title insurance policy to verify the entire transaction was legally appropriate, rather than investigate the Ward-Nash transaction. Palo Verde paid $16,344 for the Nash-Ware position plus a commission of $1,633.44. Exhibit 2.
As usual in its dealings with debtors, Palo Verde received a financial information sheet from Nash on the Ward property, Exhibit 12, and paid for an appraisal. Exhibit 20.
In August of 1982, Palo Verde had seven separate Nash-Ware transactions. At the time debtors first offered Ware-Nash notes, Palo Verde sought and obtained a legal opinion that such self-dealing was permissible. Thereafter, movant would accept such notes, unless they did not fall within its investment criterion. Schulman did not counsel Nash on how to structure his transactions to avoid the state usury law.

II.
Litigants stipulate that liens exceed the parcel's value, assuming the validity of movant's interest. Transcript of May 23, 1984, at 4, lines 4-8. (Hereafter "Transcript, at ______"). If the Palo Verde interest is invalid, there would be some estate equity based on an appraised value of $39,000 and liens of Utah Mortgage and intervenor Ward of approximately $15,000 each. Exhibit 16; 11 U.S.C. § 362(d)(2). Such an equity cushion may or may not be sufficient to allow stay to remain in effect for an additional time, presumably to allow sale of the home. Accordingly, the validity of Palo Verde's lien must be determined.

III.
Intervenor first argues Palo Verde is not a holder in due course of the Ware-Nash paper and is thus subject to defenses available to any party. A.R.S. § 47-3306(2); *259 U.C.C. § 3-306. The present defenses include fraud and lack of consideration between Ware and Nash in their dealings.
Ward complains her transaction was fraudulent because her understanding was that her purchaser would only encumber the home for around $11,000. She further argues she was uninformed the prior encumbrance would benefit Nash personally, or that ultimate financing came from Palo Verde.
In fact, Ms. Ward's testimony establishes she had no prior understanding there was a specific limitation on the amount of the prior lien to be placed on the home. Addendum A to the purchase contract of July 16, 1982, signed by her and specifically referred to in the contract, reflects an agreement any new priority lien would "at least" be in an amount sufficient to return Nash's investment and costs. Exhibit 4, at 2; Transcript, at 13, lines 14-19; p. 23, lines 15-22; p. 27, lines 19-25; p. 28, lines 1-8; p. 29, lines 11-15; p. 33, lines 22-25; p. 34, lines 1-2.
She was further aware of the exact amount of the $18,500 prior lien by the August 16, 1982 amendment to escrow instructions, which she signed prior to receiving her check. Exhibit 7, at 5. Certainly, she was free to inquire as to the identity of the beneficiary of the lien and refuse to close until she received answers to her satisfaction. This she did not do.
The criminal case of State v. Haas, 138 Ariz. 413, 675 P.2d 673 (1983), does not mandate a finding of fraud here. Haas upheld a real estate broker and agent's fraud conviction when he was aware (1) the language used in a purchase contract to describe "security" for the deferred balance would be insufficient to establish a lien, and (2) he knew the sellers probably would not realize this was the case. 675 P.2d, at 679-81.
This is distinguishable from the present circumstances where Ms. Ward did receive a valid lien which attaches to at least some equity in the $39,000 home. Her lien would have been fully secured, had she not agreed to subordinate. The existence of this equity, unlike the situation in Haas, and the plausible explanation for the demise of debtors' operations, due to high interest rates and collapse of the housing market, establishes no fraudulent intent here.
Further support for this finding is evidenced by Nash's description of the Ware-Nash transactions as an ill-considered attempt to avoid nonexistent usury laws. While such machinations were neither praise-worthy nor effective, the explanation is credible. Debtors' testimony is consistent with the large number of transactions in which this dubious method was utilized prior to the Ward contract.
Finally, the source of the funds for the second lien are not material to the fraud issue. As early as the day of the purchase contract, intervenor Ward was given notice Nash intended to refinance:
Buyer advises seller that buyer may desire to obtain a new loan on subject property in an amount sufficient at least to return buyer's investment and costs, and seller agrees that said new loan may be recorded prior to the deed of trust created in 4 above. To facilitate this, the deed of trust will incorporate a thirty day substitution of collateral clause. This explanation is given so seller will clearly understand buyer's intentions with regard to subject property.
Exhibit 4, at 2, ¶ 5.
Before her escrow would close, Ms. Ward was required to read and sign the following amendment:
Seller is aware and understands that the buyer herein, WARE PROPERTIES, INC., has elected to place a secondary loan on the property conveyed in this escrow, thereby placing the seller's Note and Deed of trust created herein, in third position. The terms of the second Note and Deed of Trust are as follows:
The sum of $18,500.00 payable in regular monthly installments of $246.67 or more, due on or before the 15th day of every month, beginning October 15, 1982, with interest at the rate of 16% per annum, *260 from 8-20-82 (Close of escrow), the interest to be first deducted from the regular monthly installment and the balance to be applied upon the principal; PROVIDED HOWEVER, if not sooner paid the entire unpaid balance of principal and interest is all due and payable on NOVEMBER 15, 1985.
All other terms and conditions remain the same.
Exhibit 7, at 5. As previously noted, Ms. Ward was free to demand additional information concerning this refinancing, including the complete identity of all parties. Accordingly, I find no fraud as to Ms. Ward.

IV.
This leads to intervenor's challenge for lack of consideration. The first complaint is that Ware Properties, Inc. did not receive consideration for the $18,500 note it executed to Nash. Exhibit 11. There can be no dispute debtors did not respect the status of Ware Properties as a separate legal entity, or that the corporation's books are out of balance and incomplete. There likewise can be no credible argument that $18,500 in cash actually changed hands. Debtors admit they treated corporate and personal accounts as one and the same as early as 1981. Transcript, at 49-58, 97. Regardless, Ware Properties received adequate consideration for its execution of the documents.
At least $7,396 of the Palo Verde sale proceeds went to fund the corporation's escrow with Ms. Ward. Exhibit 2, at 1. Of the proceeds' remainder, $8,593.50, was deposited in the corporation's savings account. Although Nash could not recall into which account the funds were deposited, Transcript, at 86, 91-92, Ware's bookkeeper declared emphatically the money went into the company's account. Transcript of July 12, 1984, at 121, 122, 126-27.
Ware's August, 1982 ledger supports this testimony. Exhibit 2. No bank records to the contrary were received. Finally, as record owner, Ware received the benefits of Nash's expenditure of $3,000 worth of improvements to the home prior to sale. Intervenor did not attempt to establish these funds came instead from the corporation. Accordingly, sufficient consideration for the Ware-Nash transaction was received by the corporate entity.

V.
More problematic is the assertion the Ware-Nash note and trust deed are invalid because Ware is a mere alter ego. The constant commingling of corporate and personal funds certainly points in that direction. Regardless, a finding of alter ego is not enough. It is also necessary to find that adherence to the fiction of the entity's separate existence would sanction a fraud or injustice in the particular circumstances. Home Builders & Suppliers v. Timberman, 75 Ariz. 337, 344-45, 256 P.2d 716, 721 (1953), citing Phoenix Safety Investment Co. v. James, 28 Ariz. 514, 237 P. 958 (1925). I cannot find such conditions here.
Ms. Ward agreed to subordinate her secured position, knowing full well a priority lien would imperil her security upon default. That is precisely what occurred. Debtors' continuous violence to the concept of a corporation's separate existence was not fraudulent as to her. Intervenor's cited cases do not compel a different result.
Yosemite Portland Cement Corp. v. State Board of Equalization of California, 59 Cal.App.2d 39, 138 P.2d 39 (1943); Canandaigua National Bank & Trust v. Commercial Credit Corp., 285 A.D. 7, 135 N.Y.S.2d 66 (N.Y.App.Div.1954) and Forest Investment Corp. v. Chaplin, 55 Ill.App.2d 429, 205 N.E.2d 51 (1965), are urged for the proposition there must be two separate entities to create a valid contract. Yosemite Portland stands for that principle but factually has no relevance. 138 P.2d, at 40. Canadiagua National Bank and Forest Investment involve nonentity proprietorships purporting to contract with their sole owners, with a subsequent assignment of the paper to institutional lenders. Although the conditional sales contracts were found invalid for lack of sufficient parties, the courts did construe the transactions as *261 sufficient to transfer title or constitute a chattle mortgage. 205 N.E.2d, at 54; 135 N.Y.S.2d, at 68-69. By contrast, Ware Properties is arguably a legal entity which a proprietorship never can beand intervenor's alter ego argument has been rejected.

VI
Palo Verde's holder in due course status is also attacked because of an alleged improper endorsement through an allonge. An allonge is a paper annexed to an instrument containing endorsements for which there is no room on the instrument itself. Black's Law Dictionary 70 (5th ed. 1979). Under Arizona law, an endorsement must be on the instrument or on a paper so firmly affixed as to become part of the instrument. A.R.S. § 47-3202 B; U.C.C. § 3-202(2). The assignment was signed and notarized by Ms. Dersham on August 13, 1982, the same day as the Ware-Nash notarized trust deed. Exhibit 11, at 5. It specifically references the Nash-Palo Verde escrow number, identifies Ware Properties as the maker of the assigned note and its date, and recites that the note is to be attached to the assignment. Supra. Vice President Russell O. Riggs of the escrow company could not specifically recall if the note and assignment originally had been stapled together. The company's file had been pulled apart, copied and put back together. There is no set file policy as to the order in which the documents are kept. Their present order, in which the note and assignment are physically separated, bears no significance to their original receipt. Transcript, at 43-48. Given the clear intent that the note and assignment were to be physically attached, the evidence is insufficient to establish an invalid endorsement under A.R.S. § 47-3202 B.

VII.
Intervenor also argues Palo Verde cannot be a holder in due course because it accepted the paper with sufficient knowledge to question its validity. A.R.S. § 47-3304 A(1). Notice of such defense will defeat Palo Verde's status. A.R.S. § 47-3302 A(3).
Although Palo Verde estimates 30-35 prior dealings, no evidence was presented establishing it had notice Nash was commingling personal or corporate assets. The critical time for such notice is when Palo Verde came into possession of the note and trust deed. Mecham v. United Bank of Arizona, 107 Ariz. 437, 441-42, 489 P.2d 247, 251-52 (1971). Movant cannot avoid such notice by refusing to investigate, if it possessed sufficient facts to suggest an irregularity. Stewart v. Thornton, 116 Ariz. 107, 109, 568 P.2d 414, 416 (1977). No Arizona case establishing a duty to investigate in a similar factual situation has been cited here. If movant lacks knowledge of suspicious circumstances, it is under no duty to investigate the financial position of its transferor. Chemical Bank of Rochester v. Haskell, 51 N.Y.2d 85, 93-94, 432 N.Y.S.2d 478, 479-481, 411 N.E.2d 1339, 1340-42 (1980). The mere fact of prior dealings, or close connections, between movant and debtors does not by itself justify denial of holder in due course status. Christinson v. Venturi Construction, 109 Ill.App.3d 34, 64 Ill.Dec. 674, 676-677, 440 N.E.2d 226, 228-29 (1982).
No particular factors are present which would mandate additional investigation by Palo Verde. Nor do I discern fraud, lack of consideration or any other viable defense which could be discoverable had such duty arose.

VIII.
Ms. Ward's knowing subordination of her lien rights to an $18,500 security interest in a modest home already carrying a first mortgage may not have been wise in hindsight. Certainly, debtors' ill-advised and abortive attempts to avoid a nonexistent usury bar cannot be condoned.
Regardless, as one opposing modification of stay, intervenor has failed to carry her burden of establishing the existence of fraud or any other viable defense which could be asserted against assignee Palo *262 Verde. 11 U.S.C. § 362(g). Movant, possessing a valid lien as a holder in due course, is entitled to relief from stay to foreclose upon the parcel as debtors' property. Relief from stay will be effective ten days from the date of this memorandum.
ORDERED ACCORDINGLY.
NOTES
[1] Identified as "AW Nash or Nominee." Respondent's Exhibit 4, at 1.
[2] Ms. Ward received this advance from Nash on July 17, 1982 to finance her move to an apartment.