880 P.2d 132

**STATE of Arizona, Appellee,**

v.

**Robert E. JOHNSON, Appellant.**

**No. CR–93–0340–PR.**

Supreme Court of Arizona,
En Banc.

Aug. 2, 1994.

■■■■■■■■■

Grant Woods, Atty. Gen. by Paul J. McMurdie, Dawn M. Northup, Phoenix, for appellee.

John M. Antieau, Phoenix, for appellant.

## OPINION

Memorandum Decision of the Court of Appeals, Division One filed June 1, 1993 vacated

FELDMAN, Chief Justice.

A jury convicted Defendant Robert Earl Johnson of one count of fraudulent scheme and artifice (hereinafter "fraud"). The trial court sentenced Defendant to concurrent terms of nine years for fraud and four years on an earlier conviction, for which he was on probation at the time he allegedly committed the fraud. By memorandum decision, the court of appeals affirmed. *State v. Johnson*, No. 1–CA–CR 91–0935 (June 1, 1993). We granted Defendant's petition for review, believing that the court of appeals may have erred in its application of the law. *See* Ariz. R.Civ.App.Proc. 23(c)(2). This court has jurisdiction under Ariz. Const. art. 6, § 5(3) and A.R.S. § 12–120.24.

## FACTS

From January 2 until March 31, 1990, Defendant was a driver for Delivery Systems Inc. (DSI), a trucking company. By contract, Cardlock Fuel Services (Cardlock) provided gasoline for all DSI vehicles. DSI gave its drivers cards that let them obtain gas at any Cardlock station. The cards were similar to bank debit cards and activated the pump when inserted into a Cardlock machine. Cardlock then billed DSI for all gasoline purchases. Although employees were not authorized to use the cards for personal gas purchases, DSI had no system to track the issuance and use of its cards, nor any way to ensure that issued cards were returned.

A Cardlock employee eventually noticed unusual activity at one station and suspected that someone was using DSI cards to fuel non-DSI vehicles. The employee reported the activity to his supervisor, who informed DSI. DSI called the police, who set up a stakeout and arrested Billy Ivery shortly after he finished fueling a motor home by using a DSI card. Ivery was not a DSI employee and the motor home was a personal vehicle.

During police questioning, Ivery implicated his cousin, Robert Earl Johnson (hereinafter "Defendant"). Ivery said his cousin gave him the card in late January 1990 (a few weeks after Defendant went to work for DSI) so that Ivery could exchange gasoline for drugs and cash. The two then split the proceeds.

Based on Ivery's statement, police arrested Defendant at work on March 31, 1990. In addition to the card that Ivery had when arrested, police found another Cardlock fuel card in Defendant's wallet. Testimony showed that the two cards, and particularly Ivery's card, were used far more than most DSI cards. For example, on some days the same card was used three different times. Once, a card apparently was used to fill a vehicle with a greater gasoline capacity than any DSI vehicle. Because of lax security, Defendant had used other cards to fill his company truck, although he had not returned the two cards the police had seized.

In exchange for testifying against Defendant, Ivery obtained a favorable plea agreement.[1] Defendant was convicted of fraudulent scheme or artifice, a class 2 felony. *See* A.R.S. § 13–2310(A). The court of appeals affirmed the trial court's judgment. We granted review to determine whether the trial court had erred in refusing to grant Defendant's motion for a directed verdict of acquittal on the fraud charge.

We conclude that the trial court erred because Defendant should have been convict-

---

1. Ivery pleaded guilty to the charge of fraudulent scheme or artifice, A.R.S. § 13–2310(A). In exchange for testifying, the state agreed to allege only one of his three prior felony convictions, effectively reducing his sentence.

ed only of theft, a class 3 felony, under the facts of this case. *See* A.R.S. § 13–1802(C).

## DISCUSSION

The fraudulent scheme and artifice statute provides, in pertinent part:

> Any person, who, pursuant to a scheme or artifice to defraud, knowingly obtains any benefit *by means of false or fraudulent pretenses, representations, promises or material omissions* is guilty of a class 2 felony.

A.R.S. § 13–2310(A) (emphasis added).

In support of his acquittal motion, Defendant argued that "there's been no evidence that [he] used any fraudulent pretenses, that he made any fraudulent representations, promises or material omissions." The state made various responsive arguments at different stages of the proceedings. At trial, it argued that "the acts that constitute the fraudulent pretenses and misrepresentations are the defendant's representation to his company that when he took possession of those cards that they would only be used for legitimate business purposes ..." There was, however, no evidence that Defendant made any statement or omission to gain possession of the cards.

The state proffered an alternate misrepresentation theory to the court of appeals: "Appellant *made* or *used*, false representations or false pretenses when he used the Cardlock fuel card, or allowed someone else to use the card, for his own personal gain knowing it was his employer who paid for the gas." Emphasis in original. Again, the record contains no evidence of any statement or representation at the time the card was inserted into the pump.

The state best summarized its position at oral argument before this court. Rather than pointing to an explicit statement or representation, the state claimed that the fraud statute is satisfied when an employee breaches the trust relationship automatically arising from employment. The state argued that, by accepting employment, Defendant implicitly represented to his employer that he would act honestly. The representation is particularly to be implied, the state contend-

ed, when, as in this case, the employer entrusted the employee with something of value to be used for a specific or limited purpose. DSI entrusted Defendant with a gas card and, therefore, the gas. When it did so, Defendant implicitly agreed to use the card only for the employer's authorized purpose—to purchase gas for company vehicles. He also implicitly agreed to use the gas only for company business.

### A. Characterizing the statute

In *State v. Haas*, we clarified and explained the statutory elements necessary to support a fraud conviction under § 13–2310(A):

> [T]he state must prove not only (1) a scheme or artifice to defraud, but also that (2) defendant knowingly and intentionally participated in it and that (3) it was a scheme for obtaining money or property *by means of "false or fraudulent pretenses, representations or promises."*

138 Ariz. 413, 419, 675 P.2d 673, 679 (1983) (emphasis added).

In the present case, the first two elements are undisputed. The state proved Defendant knowingly acted pursuant to a scheme when Defendant provided the card and planned the thefts with his cousin, who supplied customers willing to pay money or drugs for gas. The state also proved Defendant obtained benefit from this scheme. Defendant does not challenge these findings, but argues on appeal, as he did at trial, that he did not obtain the benefit by means of a false pretense, representation, or promise.

The state responds that there need not be an actual misrepresentation or even a material omission. We agree. It is possible to satisfy this statutory element by a false pretense, including a subterfuge, ruse, trick, or dissimulation upon another. *Id.* at 422, 675 P.2d at 682. The state points to our words in *Haas:* "the definition of 'fraud' must be broad enough to cover all of the varieties made possible by boundless human ingenuity." *Id.* at 424, 675 P.2d at 684.

*Haas* exemplifies the type of ingenuity the statute must be broad enough to cover. In *Haas*, the defendant made numerous agree-

ments to purchase real estate from his victims. In doing so, the defendant intimated that a mortgage on the property secured the purchases. In reality, only worthless securities backed the purchases. Although the defendant's purchase agreement reflected the true security, it was so worded that an average person might believe it meant something else. The defendant claimed he never lied about the security and, on the contrary, always answered truthfully when asked about the clause in the agreement. Presumably those who asked did not complete the deal, leaving only those who were misled to enter into the agreement. Thus, we held the facts in *Haas* sufficient to support a finding that the defendant obtained a benefit by misrepresenting the nature of the agreement, knowingly leading gullible persons to believe that the contract contained provisions giving the purchaser security when, in reality, it did not.

*Haas* illustrates the special type of crime the fraud statute was intended to cover. It contemplates swindles, Ponzi schemes, confidence games, and similar frauds in which the perpetrator takes advantage of the victim by inducing the latter to turn over property or money based on a false picture painted by the perpetrator. The statute's scope is illuminated by its history, for it was adopted almost chapter and verse from the federal mail fraud statute.[2] *See id.* at 418, 675 P.2d at 678; *State v. Moses,* 123 Ariz. 296, 297, 599 P.2d 252, 253 (Ct.App.1979).

Congress enacted the first version of the federal mail fraud statute shortly after the Civil War to combat a wide variety of ingenious postal frauds. *See* Gregory Howard Williams, *Good Government by Prosecutorial Decree: The Use and Abuse of Mail Fraud* (hereinafter *"Use and Abuse of Mail Fraud"*), 32 Ariz.L.Rev. 137, 140 (1990). A Congressman who introduced an early version of the mail fraud statute "referred to the problem as 'frauds which are mostly gotten up in the large cities ... by thieves, forgers, and rapscallions generally, for the purpose of

deceiving and fleecing the innocent people in the country.'" *Id.* at 140–41 (quoting H.R. No. 2295, Cong.Globe, 41st Cong., 3d Sess. 35 (1871)). Common frauds included offers of obscene materials, lotteries, gift schemes, and counterfeit money hoaxes known as "sawdust swindles." *Id.* All of these contemplate, as their basis, a false pretense created by the defendant to induce the victim to turn over property, services, or money.

## B. Fraud versus theft

■ False pretense is the key element of fraud. *State v. Rios,* 246 Kan. 517, 792 P.2d 1065, 1070 (1990) ("reliance upon the false pretenses which induced the owner to part with his property is generally considered to be an essential element of the crime ... throughout this country"). False pretense, created through words or omissions, is the act that separates fraud from routine theft. The statute's language means that the false pretense must actually cause the victim to rely and, as a result, give property or money to the defendant. *See id.* at 1072; *State v. Hauck,* 190 Neb. 534, 209 N.W.2d 580, 584 (1973). The other two elements of fraud are satisfied in almost every theft because thefts generally occur pursuant to a plan and result in the perpetrator receiving a benefit.

■ Thus, we contrast the fraud statute with the theft statute, A.R.S. § 13–1802. Particularly relevant is § 13–1802(A)(2), which codifies common-law embezzlement. Theft by embezzlement occurs when a person "converts for an unauthorized ... use ... property of another entrusted to the defendant or placed in the defendant's possession for a limited, authorized ... use." *Id.* This, of course, is the essence of employee theft. The state relies on the classic element of embezzlement—trust arising from the employment relationship—to argue that whenever employer trust is violated, the misrepresentation element of fraud is satisfied. We disagree. There is a difference between

2. The parent federal statute now provides:
    Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or

promises ... for the purpose of executing such scheme or artifice ... shall be fined not more than $1,000 or imprisoned not more than five years, or both.
18 U.S.C. § 1341.

fraud and theft. Although breaching a trust relationship *may* lead to fraud, it does not do so unless the distinguishing element of fraud is present. *See Parr v. United States,* 363 U.S. 370, 393–94, 80 S.Ct. 1171, 1185, 4 L.Ed.2d 1277 (1960) (holding that commission of embezzlement did not establish mail fraud conviction).

In *Haas,* we acknowledged the persuasive value of decisions construing the federal mail fraud statute in our construction of § 13–2310(A). 138 Ariz. at 418, 675 P.2d at 678 (citing *Arizona Civil Rights Div. v. Olson,* 132 Ariz. 20, 25–26, 643 P.2d 723, 728–29 (Ct.App.1982)). The issue of embezzlement versus fraud was addressed directly in *United States v. Beall,* 126 F.Supp. 363 (N.D.Cal. 1954). In *Beall,* the treasurer of a charitable agency diverted contributions for his own use and attempted to cover up the crime by claiming the funds had been turned over to another employee. The court succinctly held that "the mail fraud statute was not meant to apply to persons who violate a position of trust and confidence by embezzling funds that come into their hands ... lawfully...." *Id.* at 366.

■ What, therefore, must determine whether Defendant obtained a benefit by means of a false pretense? Although this pretense need not be by affirmative misrepresentation, it must be by more than the implied promise of honesty alleged by the state. If we were to hold that employee theft is a more serious crime than other thefts simply because of a breach of the "implicit promise" made in a trust relationship, why not impose the same penalty on a dinner guest who purloins a silver serving spoon in violation of the host's trust? We cannot seriously say that the thief who decides to steal while eating dessert can be convicted of a scheme or artifice to defraud simply because the thief also breached an implicit representation of honesty. Thus, betrayal of an implicit belief in the honesty of one's friends or employees, alone, does not support the misrepresentation element of fraud. *See United States v. Pinto,* 548 F.Supp. 236, 245 (E.D.Pa.1982) ("the breach of an employee's fiduciary duty, without more, does not constitute [fraud]"). Given

the explicit wording of A.R.S. § 13–2310(A), the state must prove specific facts showing that Defendant obtained some benefit "by means of" a specific false picture or pretense. *Haas,* 138 Ariz. at 423, 675 P.2d at 683.

**C. Was there false pretense in this case?**

In the present case, Defendant arguably received two different benefits. The first was the cards that allowed Defendant to obtain the gas, and the second was the gas itself. It is necessary, in light of the above discussion, to examine Defendant's actions to determine if he misled his employer in some way to induce the employer to give him the cards or gas.

**1. *Obtaining the card***

■ The state conceded at oral argument that Defendant probably had formulated the plan to steal the gas after he was hired. *Cf. Lovick v. State,* 646 P.2d 1296, 1297–98 (Okl. Crim.App.1982) (if criminal intent exists when property is entrusted to defendant, it is fraud; if criminal intent is formed after taking possession, it is embezzlement). Presumably, it was only when Defendant saw the lax card security that he realized he could steal with relative impunity. Moreover, the state offered no evidence that after being hired Defendant received the gas cards by means of an explicit statement, misleading representation, or omission, either when he was hired or when he obtained the cards. *Cf. Carpenter v. United States,* 484 U.S. 19, 27–28, 108 S.Ct. 316, 321, 98 L.Ed.2d 275 (1987) (where journalist sold confidential information after making specific promise to keep it secret, the false pretense element of wire fraud was satisfied).

On the contrary, in its closing argument the state alleged that "[the supervisor] didn't give [Defendant] that card [found in his wallet]. And I suggest to you that *he helped himself to that card.*" (Emphasis added.) In summing up the testimony, the state contended that not only did Defendant steal the gas, he *stole* the card as well. Thus, not only is there no evidence in the record that Defendant induced DSI to give him gasoline cards by misrepresenting or concealing his true intent, *cf. Lovick,* 646 P.2d at 1297–98, but

the state's own argument was to the contrary. Thus, the record supports no finding that Defendant committed fraud in obtaining the gas cards.

### 2. *Getting the gasoline*

[6] The ultimate benefit Defendant received was the gas. The state argues that because Defendant knew DSI was paying the bill, Defendant misled his employer into believing the gas was for the company's benefit every time he misused a gas card. The problem with this argument is that Defendant created no pretense, made no representation, and concealed nothing from his employer when he used the card by inserting it into Cardlock's pump.

An analogy may help. Suppose a jeweler entrusts an employee with the key to a display case. Pursuant to a later-devised plan, the employee waits for the jeweler to leave and then uses the key to steal jewelry from the case, committing theft by embezzlement. *See* A.R.S. § 13–1802(A)(2). The employee does nothing other than use the key to obtain the jewelry and lie about it later. This is not fraud because the fraud statute requires a false pretense to be the *means by which the benefit is obtained,* not the means to avoid detection.

The fact that Cardlock billed DSI, which paid the bill believing that the gas had been obtained for DSI-approved uses, also fails to support the state's theory. For example, in *Parr,* the defendants were charged with multiple counts of mail fraud. Three counts arose from actions almost identical to those in the present case. The *Parr* defendants used their employer's credit card to obtain gas and other products at a gas station, knowing that the gas company would bill the employer through the mail. The government argued that mailing the bill satisfied the mail fraud statute's requirement that defendants used the mail to carry out their scheme. In reversing the convictions, the Court held:

"The scheme in each case had reached fruition" when [defendants] received the goods and services complained of. "The persons intended to receive the [goods and services] had received [them] irrevocably. It was immaterial to them, or to any con-summation of the scheme, how the [oil company].... would collect from the [employer]. It cannot be said that the mailings in question were' for the purpose of executing the scheme, as the statute requires."

*Parr,* 363 U.S. at 393, 80 S.Ct. at 1184 (quoting *Kann v. United States,* 323 U.S. 88, 94, 65 S.Ct. 148, 151, 89 L.Ed. 88 (1944)).

As in *Parr,* the crime in this case reached fruition before Cardlock sent the bill to DSI. In fact, it would probably have helped Defendant if Cardlock had never billed DSI at all. Thus, any misrepresentation conveyed to DSI through sending the bill occurred after completion of the crime and could not support an essential element of fraud any more than mailing of the bill in *Parr* could support an essential element of mail fraud.

The Kansas Supreme Court reached the same conclusion in a strikingly similar case. In *Rios,* two department store managers were convicted of theft by deception, which, like the statute at issue in the present case, requires that the defendant obtain the benefit by misrepresentation. *See* Kan.Stat.Ann. § 21–3701(b) ("obtaining control over property by deception"); *see also Rios,* 792 P.2d at 1071. The defendants stole money from cash registers and replaced it with phony customer refund vouchers. The court found that as store managers, the defendants were entrusted with access to safes, cash rooms, and vouchers. Although the defendants knew their employer would believe the vouchers were for a customer and would bear the expense, the court held that the "bogus vouchers were used to cover up the thefts, not to cause the corporation to part with the monies represented by the vouchers." *Id.* at 1072; *see also United States v. Maze,* 414 U.S. 395, 402–03, 94 S.Ct. 645, 649–50, 38 L.Ed.2d 603 (1974). The *Rios* court found that no pretense or representation was made, however, to induce the store to give the defendants the vouchers—they stole them. 792 P.2d at 1072. Thus the court held the facts supported a finding of embezzlement but theft by deception. *Id.* at 1072–73.

The same reasoning applies in the present case, in which Defendant did nothing other

than use the cards to steal gas, presumably hoping DSI would pay for it without noticing. Cardlock's affirmative act of billing DSI after the fact, even with the appearance that the gas was for company use, could still not satisfy the false pretense element unless it was Defendant's method for obtaining the benefit from the employer/victim.

### 3. *Other theories*

■ Finally, in support of the fraud charge, the state mentioned the high number of thefts. That fact supports the scheme or artifice element of fraud. However, we see no necessary relationship between frequency of theft and false pretenses. Ten embezzlements may prove one fraudulent scheme but do not necessarily equal one false pretense. *Rios* again has analogous facts. The defendants in that case apparently cashed phony vouchers more than fifty times, stealing over $400,000. *Id.* at 1068. Nonetheless, the court found the false pretense element lacking.

In upholding the conviction in the present case, the court of appeals stated that "it was defendant's very awareness and decision to take advantage of this trust-based system that allowed him to succeed in his scheme." *Johnson*, mem. dec. at 5. We agree with the premise but not the conclusion. As noted above, a mere breach of trust does not translate into a false pretense. DSI was not persuaded to give Defendant gas based on a false pretense or misrepresentation. The manner in which Defendant took the gas is, at most, evidence of a scheme and an attempt to avoid detection. Not all schemes for theft can be prosecuted as thefts by fraudulent scheme.

### CONCLUSION

■ Employee theft does not always constitute fraud, even if committed pursuant to a plan and even if a benefit is obtained. This is not to say that a crime can never satisfy the overlapping elements of both theft and fraud. Nor do we hold that words are required. But the fraud statute explicitly requires an additional element—a false pretense—that is not necessary to prove theft. *See Parr,* 363 U.S. at 393–94, 80 S.Ct. at 1185.

In *Haas,* we gave the fraud statute a broad interpretation, encompassing situations in which the perpetrator knowingly misled his victims by painting a false picture even though he neither misrepresented nor omitted a material fact. But this interpretation of the statute, no matter how broad, cannot eliminate the crime's essential nature: the requirement that acting pursuant to a scheme, the perpetrator obtains the benefit by crafting a false picture or pretense.[3]

In the present case the state failed to prove that Defendant obtained gas by means of a false or fraudulent pretense, representation, promise, or material omission, as required by the fraudulent scheme statute, A.R.S. § 13–2310(A). Under the evidence, Defendant could be guilty of theft but not of obtaining property by fraudulent scheme or artifice. Thus the trial court erred in not granting Defendant's motion for acquittal on the fraud charge. We therefore vacate the court of appeals' decision, reverse the fraud conviction, and remand for further proceedings consistent with this opinion.

MOELLER, V.C.J., and CORCORAN, ZLAKET and MARTONE, JJ., concur.

---

3. Ironically, the federal mail fraud statute has weathered similar attacks from commentators arguing that the federal government has wrongfully expanded the scope of the statute beyond its intent. *See, e.g., Use and Abuse of Mail Fraud,* 32 Ariz.L.Rev. at 137. Apparently, the United States Supreme Court agrees that the statute should be construed in a more limited manner. *See McNally v. United States,* 483 U.S. 350, 359–60, 107 S.Ct. 2875, 2881–82, 97 L.Ed.2d 292 (1987) (holding mail fraud statute's application to intangible loss of honest employee service is beyond scope of statute).