IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

STATE OF ARIZONA, *Appellee*,

*v.*

STEVEN WATSON, *Appellant*.

No. 1 CA-CR 18-0838
FILED 1-21-2020

Appeal from the Superior Court in Maricopa County
No. CR2017-002189-001
The Honorable Susanna C. Pineda, Judge

**CONVICTIONS AFFIRMED; SENTENCES VACATED AND
REMANDED**

COUNSEL

Attorney General's Office, Phoenix
By Joshua C. Smith
*Counsel for Appellee*

Maricopa County Public Defender's Office, Phoenix
By Carlos Daniel Carrion
*Counsel for Appellant*

---

**OPINION**

Judge Paul J. McMurdie delivered the opinion of the Court, in which Presiding Judge Samuel A. Thumma and Judge Jennifer M. Perkins joined.

---

**M c M U R D I E**, Judge:

¶1        Steven Watson appeals from his convictions and sentences for one count of fraudulent schemes and artifices and seven counts of theft. We affirm Watson's convictions but hold: (1) the superior court imposed an unlawful sentence under Arizona Revised Statutes ("A.R.S.") section 13-116 by imposing a term of probation for Watson's fraudulent schemes and artifices conviction to be served consecutively to the sentences of imprisonment for the theft convictions resulting from the scheme; and (2) although probation is not generally considered a criminal sentence, A.R.S. § 13-116 prohibits imposing a consecutive term of probation for one offense and a term of imprisonment for another offense if they stem from the same act. As a result, we vacate Watson's sentences and remand for resentencing.

**FACTS AND PROCEDURAL BACKGROUND[1]**

¶2        In the summer of 2014, Watson began working as an associate financial advisor for BBVA Compass ("Compass"). Watson's primary job responsibility was to assist customers in opening and managing investment accounts, including withdrawing funds from bank accounts and depositing them into investment accounts. Watson was not authorized to withdraw from or deposit funds into a customer's bank account on his own. Instead, he was required to get approval from a Compass bank teller or manager to engage in any transaction involving a customer's bank account. Contrary to the bank's policy, during the time Watson worked at Compass, tellers and managers at the branches where Watson worked allowed financial advisors to withdraw funds on a customer's behalf without requiring the customer to be physically present, or the advisor to show the customer's identification for the transaction. Based on this unauthorized practice, at the

---

[1]        We view the facts in the light most favorable to upholding the verdict and resolve all reasonable inferences against Watson. *State v. Burgess*, 245 Ariz. 275, 277, ¶ 3 (App. 2018).

request of a financial advisor like Watson, tellers would generate a cashier's check for the withdrawn funds and memorialize the transaction in writing.

¶3        In the fall of 2014, Watson and an acquaintance, Maja Birkholz, hatched a scheme to steal money from Compass customers. First, using his access to account information, Watson would identify bank accounts whose owners had not been in contact with the bank for some time. Watson would then ask tellers to withdraw the funds from the accounts, purportedly on behalf of the account owners. He would then have the funds paid to either Birkholz directly or to accounts owned by "Millenium[sic] Planning Group," a doing business as ("DBA") designation for Watson Consulting LLC ("Watson Consulting"), a limited liability company managed solely by Watson. Acting in line with the unauthorized local practice of the branches, the tellers would approve the requests without requiring the account owners to be present or to present the owners' identification, thereby placing the funds under Watson's and Birkholz's control. Through this scheme, Watson and Birkholz stole funds from several bank customers in October and November 2014.

¶4        On October 21, 2014, Watson asked the tellers to close out a checking account owned by the estate of D.G., who passed away in 2012. The tellers approved the transaction. Per Watson's instructions, funds within the account were distributed as follows: (1) a cash withdrawal of $7607.06, of which Watson and Birkholz took an even split; (2) a cashier's check for $7500 payable to Birkholz; and (3) a cashier's check for $7500 payable to Karl Sheldon (an individual who was never positively identified). The tellers memorialized the transaction in a memorandum, which stated: "per customer close account[,] ok per Steve Watson—2 cashier's checks."

¶5        Next, on October 27 and 28, 2014, Watson asked the tellers to close out three accounts owned by the estate of K.K., who passed away in 2011. The tellers approved the transactions, and the funds within the accounts were distributed as follows: (1) two cashier's checks totaling $53,162.45 payable to Watson Consulting's DBA designation; and (2) a cashier's check for $35,698.47 payable to Birkholz. For this transaction, the tellers' memoranda indicated that the owner of the account had approved the transaction "per [a] phone call" and that the "client initiated for cashier[']s check." Three days after the theft, Birkholz transferred $27,000 of the funds she received to the accounts of Watson Consulting's DBA designation.

¶6          Finally, on November 14, 2014, Watson requested that the tellers close out a savings account owned by S.S., a Texas resident. S.S. was alive at the time the theft occurred but passed away shortly afterward. The tellers approved the transaction, and the funds within the account totaling $80,667.31 were withdrawn via a cashier's check made payable to Watson Consulting's DBA designation. The memorandum for this transaction stated: "purchase cashier[']s check per Steve Watson."

¶7          Between October and December 2014, Watson spent all the funds he had stolen from D.G.'s, K.K.'s, and S.S.'s accounts on several purchases, including a motorcycle, a car titled in his wife's name, and airfare for himself, his wife, and his child. Compass was first alerted to the thefts in January 2015, when the beneficiary of two of K.K.'s accounts contacted Compass to request that the funds within the emptied accounts be liquidated. A senior fraud investigator for Compass examined the circumstances surrounding the missing funds and discovered the other thefts. During the investigation, the fraud investigator interviewed Watson, who denied any knowledge of D.G. or the circumstances surrounding D.G.'s account closure, denied any knowledge of Watson Consulting's DBA designation, and downplayed his relationship with Birkholz. The day after the interview, Watson did not return to work and did not answer any of the fraud investigator's subsequent calls. After completing her investigation, the fraud investigator reported the thefts to law enforcement.

¶8          Ultimately, the State charged Watson with: (1) one count of fraudulent schemes and artifices, encompassing every theft that occurred between October and November 2014; (2) three counts of theft of property for the withdrawals from D.G.'s account; (3) three counts of theft for the withdrawals from K.K.'s account; and (4) one count of theft for the withdrawal from S.S.'s account.[2] After an eight-day trial, during which Watson testified in his defense, the jury found Watson guilty as charged on the fraudulent schemes and artifices count and the theft counts arising from the withdrawals from K.K.'s and S.S.'s accounts. Concerning the charges related to D.G.'s account, the jury found Watson guilty of three misdemeanor counts of theft of property of a value of less than $1000.

---

[2]          The State also charged Birkholz for her role in the crimes. However, Birkholz failed to appear shortly after the proceedings against her began, and the court issued a bench warrant that remains active as of the date of this opinion. *See State v. Rhome*, 235 Ariz. 459, 461, ¶ 8 (App. 2014) (court may take judicial notice of its own records).

¶9        The superior court subsequently sentenced Watson to serve concurrent prison terms totaling six years' imprisonment on the felony theft counts, with 65 days' presentence incarceration credit and time served on the three misdemeanor theft counts. Concerning the fraudulent schemes and artifices count, the court suspended the imposition of Watson's sentence and imposed a consecutive seven-year term of probation to begin upon his release from prison. Watson appealed, and we have jurisdiction under A.R.S. §§ 12-120.21(A)(1), 13-4031, and -4033(A)(1).

## DISCUSSION

**A.     The Evidence Supports Watson's Conviction for Fraudulent Schemes and Artifices.**

¶10       Watson argues there was insufficient evidence to support his conviction for fraudulent schemes and artifices because he "made no false representations or pretense to acquire the money from" D.G.'s, K.K.'s, and S.S.'s accounts.

¶11       We review *de novo* whether substantial evidence was presented to support a conviction. *State v. Burns*, 237 Ariz. 1, 20, ¶ 72 (2015). "'Substantial evidence' to support a conviction exists when 'reasonable persons could accept [it] as adequate and sufficient to support a conclusion of [a] defendant's guilt beyond a reasonable doubt.'" *Id.* at 20–21, ¶ 72 (first alteration in original) (quoting *State v. West*, 226 Ariz. 559, 562, ¶ 15 (2011)). In reviewing the sufficiency of the evidence, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *West*, 226 Ariz. at 562, ¶ 16 (quoting *State v. Mathers*, 165 Ariz. 64, 66 (1990)). "Both direct and circumstantial evidence should be considered in determining whether substantial evidence supports a conviction." *Id.*

¶12       To support a conviction for fraudulent schemes and artifices, the State was required to prove that (1) pursuant to a scheme or artifice to defraud, (2) Watson knowingly obtained any benefit (3) by means of false or fraudulent pretenses, representations, promises, or material omissions. A.R.S. § 13-2310(A); *see also State v. Haas*, 138 Ariz. 413, 418–24 (1983) (discussing statutory elements of fraudulent schemes and artifices and their definitions under a prior version of the statute). Because Watson only challenges whether the State produced sufficient evidence for a jury to conclude beyond a reasonable doubt that he obtained the money from D.G.'s, K.K.'s, and S.S.'s accounts by means of false or fraudulent pretenses,

representations, promises, or material omissions—and because sufficient evidence was presented concerning the other elements—we only address that element.

**¶13** The fraudulent schemes and artifices statute "was, from the beginning, thought to be a law which 'encompasses a very broad range of fraudulent activities.'" *Haas*, 138 Ariz. at 422 (quoting *State v. Moses*, 123 Ariz. 296, 298 (App. 1979)). "False pretense, created through words or omissions, is the act that separates fraud from routine theft." *State v. Johnson*, 179 Ariz. 375, 378 (1994). Concerning the pretense, misrepresentation, promise, or material omission element of the offense:

> [A] defendant may be found guilty of knowingly . . . participating in a scheme or artifice to defraud . . . when that defendant has knowingly led the adverse party to believe a state of facts which is not true and when this has been accomplished either by active misrepresentations, or omitting material facts which defendant knew were being misunderstood, or by stating half-truths, or by any combination of these methods.

*Haas*, 138 Ariz. at 423. A "false or fraudulent" misrepresentation can, therefore, "be made by concealment and statements of half-truths." *Id.* at 422. And a false pretense includes any "subterfuge, ruse, trick, or dissimulation upon another." *Johnson*, 179 Ariz. at 377.

**¶14** Here, there was ample evidence from which the jury could reasonably conclude Watson obtained the money from D.G.'s, K.K.'s, and S.S.'s accounts through misrepresentations or false pretenses. Although the tellers who testified at trial could not remember the specific transactions, they testified Watson would have necessarily provided information to initiate the withdrawals and generate the cashier's checks, including D.G.'s, K.K.'s, and S.S.'s names and the identities of the payees, Watson Consulting's DBA designation and Birkholz. The documents memorializing the withdrawals also contained statements indicating Watson made representations concerning the transactions, including: "per customer close account," "ok per Steven Watson," "per phone call," and "purchase cashier[']s check per Steven Watson." Watson reinforced the accuracy of this circumstantial evidence by admitting at trial that he asked the tellers to withdraw the funds from each account and that he caused them to be distributed to Watson Consulting's DBA designation in some instances and Birkholz in others.

¶15　　　　By engaging in this conduct, Watson created a false pretense that the victims had authorized him to request and conduct the transactions. And once the transactions were completed by the tellers—thus placing the funds under his and his accomplice's control—the crime of fraudulent schemes and artifices was complete. Contrary to Watson's assertions on appeal, the fact that he took advantage of the lax procedures employed by the branches' employees does not change this conclusion; indeed, it strengthens it. By concealing his intent under the guise of the accepted, albeit unauthorized, practices of the branches in which he worked, Watson was better able to deceive the tellers into believing the fraudulent transactions were permissible. That false pretense, created by both Watson's statements and omissions, elevated Watson's conduct from routine theft to fraud. *Johnson*, 179 Ariz. at 378.

¶16　　　　Watson's reliance on *State v. Johnson*, where our supreme court held that a mere betrayal of the "implicit representation of honesty" inherent in the employment relationship was not enough to satisfy the misrepresentation element of fraud, is misplaced. 179 Ariz. at 379. In that case, the supreme court based its conclusion on the fact that the defendant "created no pretense, made no representation, and concealed nothing from his employer" by using a company credit card to purchase fuel from a fuel pump for unauthorized personal purposes. *Id.* at 380. Here, the evidence showed Watson created a false pretense that the account holders had authorized the transactions by requesting the withdrawals and providing the information necessary to complete them. This pretense, disguised within the usual practice and reliant on the specific trust the tellers placed in financial advisors like Watson, induced the tellers to allow the transactions to occur. *Id.* at 379 (breaching a trust relationship may lead to fraud so long as breach includes misrepresentation, false pretense, or omission); *see also State v. Fimbres*, 222 Ariz. 293, 297–98, ¶¶ 5–10 (App. 2009) (distinguishing *Johnson* because the defendant altered gift cards to contain victims' account information and represented the cards were valid when he made purchases with the cards). Accordingly, substantial evidence supports Watson's conviction for fraudulent schemes and artifices.

**B.** **The Superior Court Imposed an Unlawful Double Punishment by Sentencing Watson to a Consecutive Term of Probation for the Fraudulent Schemes and Artifices Count.**

    **1.** **The Theft and Fraudulent Schemes and Artifices Offenses Constituted a Single Act for Sentencing Purposes.**

¶17    In our review of the record, we discovered a potential sentencing error concerning the consecutive term of probation imposed for the fraudulent schemes and artifices count. *See State v. Woods*, 1 CA-CR06-0840, 2008 WL 2954665, at *3, ¶¶ 16–22 (Ariz. App. July 29, 2008) (mem. decision) (finding the sentence imposed for fraudulent schemes and artifices cannot run consecutive to the sentence imposed for the theft charged under the scheme). "Although we do not search the record for fundamental error, we will not ignore it when we find it." *State v. Fernandez*, 216 Ariz. 545, 554, ¶ 32 (App. 2007). "Imposition of an illegal sentence constitutes fundamental error." *State v. Thues*, 203 Ariz. 339, 340, ¶ 4 (App. 2007). We ordered supplemental briefing to address whether the term of probation imposed consecutive to the prison sentences violated Arizona's statutory prohibition of double punishment, A.R.S. § 13-116. After reviewing the parties' supplemental briefs, we conclude the fraudulent schemes and artifices count and the theft counts, in this case, are based on the same act, and that the court committed fundamental error by imposing the term of probation consecutive to the concurrent sentences for the theft counts.

¶18    The double jeopardy clauses of the United States and Arizona constitutions protect criminal defendants from multiple prosecutions and punishments for the same offense. U.S. Const. amend. V; Ariz. Const. art. 2, § 10; *see also State v. Eagle*, 196 Ariz. 188, 190, ¶ 5 (2000) (federal and Arizona double jeopardy clauses generally provide the same protections). Because greater and lesser-included offenses are considered the "same offense," the double jeopardy clauses forbid the imposition of a separate punishment for a lesser crime when a defendant has been convicted and sentenced for the greater offense. *See Illinois v. Vitale*, 447 U.S. 410, 421 (1980); *State v. Garcia*, 235 Ariz. 627, 629, ¶ 5 (App. 2014); *State v. Chabolla-Hinojosa*, 192 Ariz. 360, 362–63, ¶¶ 10–13 (App. 1998).

¶19    Statutorily, the prohibition of multiple punishments for the same act is codified in A.R.S. § 13-116, which provides: "An act or omission which is made punishable in different ways by different sections of the laws may be punished under both, but in no event may sentences be other than concurrent." Arizona uses the identical elements test to determine whether

a "constellation of facts" constitutes a single act, which requires concurrent sentences, or multiple acts, which permit consecutive sentences. *State v. Gordon*, 161 Ariz. 308, 312 (1989); *State v. Tinghitella*, 108 Ariz. 1, 3 (1971). To ensure neither the double jeopardy nor statutory mandates are violated, Arizona courts apply a three-part test outlined in *Gordon*. *See also State v. Bush*, 244 Ariz. 575, 595, ¶ 90 (2018) (reaffirming the validity of the *Gordon* test). First, the court must subtract the evidence necessary to convict on the "ultimate charge," or the charge "that is at the essence of the factual nexus" of the case and determine whether enough evidence remains to "satisf[y] the elements of the other crime." *Gordon*, 161 Ariz. at 315. Second, the court must then consider "whether . . . it was factually impossible to commit the ultimate crime without also committing the secondary crime." *Id.* Finally, the court must "consider whether the defendant's conduct in committing the [secondary] crime caused the victim to suffer an additional risk of harm beyond that inherent in the ultimate crime." *Id.*

**¶20** Under the facts of this case, the fraudulent schemes and artifices offense was the ultimate charge concerning each victim; the underlying theft charges stem directly from Watson's scheme to obtain the funds in the victims' accounts by creating the false pretense that they had authorized the transactions. The State, in the exercise of its broad charging discretion, chose to charge Watson with a single count of fraudulent schemes that encompassed every theft he committed.[3] *State v. Peltz*, 242 Ariz. 23, 27, ¶ 8 (App. 2017) ("The prosecutor has broad discretion in deciding . . . which charges to file against a defendant."); *State v. Via*, 146

---

[3] The State could have charged Watson with a separate count of fraudulent schemes and artifices for each victim. *See State v. Suarez*, 137 Ariz. 368, 374 (App. 1983) (State can charge separate fraudulent acts pursuant to single scheme as a single count of fraudulent schemes and artifices); *State v. Mullet*, 1 CA-CR 17-0179, 2018 WL 2976266, at *4, ¶ 15 (App. June 14, 2018) (mem. decision) (*Suarez* does not require the State to charge single fraudulent schemes or artifices count but allows it to "charge each event separately or all events in a single aggregate charge"). The State's reason for charging Watson with an aggregated fraudulent schemes and artifices charge became clear once it amended the indictment to add an allegation that the fraudulent schemes and artifices offense "involved a benefit with a value of one hundred thousand dollars or more," which would have rendered Watson ineligible for "suspension of sentence, probation, pardon or release from confinement" for the charge. A.R.S. § 13-2310(C). However, the jury could not agree on whether the benefits Watson obtained totaled $100,000 or more.

Ariz. 108, 116 (1985) ("[W]here numerous transactions are merely parts of a larger scheme, a single count encompassing the entire scheme is proper."). We must now subtract the evidence necessary to satisfy the elements of the ultimate charge and determine whether the remaining evidence can meet the statutory elements of theft, which requires proof that (1) Watson knowingly (2) controlled property of another (3) with the intent to deprive the other person of such property, A.R.S. § 13-1802(A)(1). Considering the elements of each offense and the facts surrounding both the theft and fraudulent schemes and artifices crimes, there is insufficient evidence to convict Watson of the theft charges once the evidence necessary to convict him of the fraudulent schemes and artifices charge is subtracted. Under the facts of this case, Watson obtained control of the victims' property at the same moment he received a benefit through his false pretense and misrepresentations. Thus, because the State would be unable to prove theft without the evidence required for fraudulent schemes and artifices, the first prong of the *Gordon* test has not been satisfied, and the sentence for the fraudulent schemes and artifices charge must run concurrently with the theft sentences.

¶21 The second and third prongs of the *Gordon* test also cannot be satisfied. Watson could not have obtained the funds from the victims' accounts using fraudulent schemes and artifices without simultaneously committing theft. *Gordon*, 161 Ariz. at 315. As for the third prong, the harm to the victims caused by the thefts—that they were deprived of their property—is the same harm they suffered as a result of the fraudulent schemes and artifices offense. *See id.*

¶22 Based on how the State charged the offenses in this case, Watson committed a single crime resulting in the commission of a series of crimes. The consecutive term of probation for the fraudulent schemes and artifices charge was, therefore, an unlawful double punishment. And because our review of the sentencing proceedings leaves us unable "to determine . . . that the trial court would have imposed the same sentences if it had been aware that consecutive sentences were not available," we must vacate all of Watson's felony sentences and remand for resentencing. *State v. Viramontes*, 163 Ariz. 334, 340 (1990).

### 2. Imposing a Term of Probation Constitutes a Sentence Under A.R.S. § 13-116.

¶23 The State attempts to avoid the *Gordon* mandate by citing our supreme court's statement in *State v. Muldoon*, 159 Ariz. 295, 298 (1988), that "[p]robation is not a sentence." The State then argues that A.R.S. § 13-116

permits a term of imprisonment and a consecutive term of probation to be imposed for offenses resulting from the same act because the statute only prohibits consecutive "sentences." However, because the State's interpretation of "sentences" in A.R.S. § 13-116 is contrary to prior caselaw interpreting the statute and would lead to absurd results, we reject the argument.

¶24    We review the interpretation of a statute *de novo*. *Bilke v. State*, 206 Ariz. 462, 464, ¶ 11 (2003). If the statute's language is clear, "the court must 'apply it without resorting to other methods of statutory interpretation' unless application of the plain meaning would lead to impossible or absurd results." *Id.* (citation omitted) (quoting *Hayes v. Cont'l Ins. Co.*, 178 Ariz. 264, 268 (1994)). When a statute's meaning cannot be found from its language alone, "we attempt to determine legislative intent by interpreting the statute as a whole, and consider the statute's context, subject matter, historical background, effects and consequences, and spirit and purpose." *Calik v. Kongable*, 195 Ariz. 496, 500, ¶ 16 (1999) (quoting *Aros v. Beneficial Arizona, Inc.*, 194 Ariz. 62, 66 (1999)). We also consider the statute "in light of its place in the statutory scheme." *Grant v. Bd. of Regents of Univ. and State Colls. of Ariz.*, 133 Ariz. 527, 529 (1982).

¶25    "Trial courts have no inherent authority to suspend a prison sentence and impose probation." *State v. Bowsher*, 225 Ariz. 586, 587, ¶ 6 (2010). That power "must be found in the statutes of the state." *Id.* (quoting *State v. Bigelow*, 76 Ariz. 13, 18 (1953)). In *Muldoon*, our supreme court held that the superior court was not required to warn a defendant that he would be subject to mandatory consecutive sentencing if he were to violate the terms of his lifetime probation because Arizona Rule of Criminal Procedure 17.2(B), now 17.2(a)(2), only required the court to inform defendants of "special conditions regarding sentencing," not probation. 159 Ariz. at 297–98. In so holding, the court reiterated the long-recognized distinction between a sentence and probation:

> A sentence is a judicial order requiring a defendant convicted in a criminal case to presently suffer a specified sanction such as incarceration, monetary fine, or both. Probation is a judicial order allowing a criminal defendant a period of time in which to perform certain conditions and thereby avoid imposition of a sentence. . . . If the conditions are performed, the court need not impose the sentence because the defendant has proven himself or herself worthy not to suffer such sentence. If the conditions of probation are not performed, however, the court may vacate the order suspending the imposition of sentence,

and then impose sentence, including such sanctions as it might have in the first instance.

*Id.* at 298; *see also Pickett v. Boykin*, 118 Ariz. 261, 262 (1978); *State v. Risher*, 117 Ariz. 587, 589 (1978); *State v. Smith*, 112 Ariz. 416, 419 (1975). Although these cases stand for the general principle that probation and a criminal sentence are not synonymous, the supreme court at the same time acknowledged the need for probation to be treated as a sentence when the failure to do so would produce inconsistent and illogical results. *See, e.g.*, Ariz. R. Crim. P. 26.1 cmt. (1973) ("The term sentence as used in this rule does include probation even though in most cases . . . imposition of sentence must be suspended in order to place a person on probation." (citation omitted)); *State v. Fuentes*, 26 Ariz. App. 444, 446–47 (1976) (probation treated as a sentence for the purpose of calculating the time to appeal), *aff'd and adopted*, 113 Ariz. 285 (1976).

**¶26**        Thus, in the years following *Muldoon*, Arizona courts have disregarded traditional distinctions between probation and a sentence when unique situations require it. *See, e.g.*, *State v. Peek*, 219 Ariz. 182, 183, ¶¶ 5–6, 20 (2008) (citing A.R.S. § 13-4037, which permits correction of an illegal sentence, in decision vacating illegal lifetime probation term); *State v. Mathieu*, 165 Ariz. 20, 23–25 (App. 1990) (defendant entitled to presentence incarceration credit for a mandatory prison term condition of probation under statute granting credit to defendants "sentenced to imprisonment"); *State v. Falco*, 162 Ariz. 319, 321 (App. 1989) (Arizona Rule of Criminal Procedure 24.3, which permits a trial court to correct "unlawful sentence," applies to the imposition of probation); *State v. Bouchier*, 159 Ariz. 346, 347–48 (App. 1989) (illegal term of probation is fundamental error "as is an illegal sentence," and may be modified by an appellate court under A.R.S. § 13-4037).

**¶27**        More broadly, this court has recognized that the lines between sentencing and probation within our criminal code "have blurred" over time. *Mathieu*, 165 Ariz. at 24. For example, A.R.S. § 13-603, which outlines Arizona's sentencing scheme, contains several subsections where a "sentence" as used in the text either explicitly or necessarily encompasses probation. *See, e.g.*, A.R.S. § 13-603(A) (every person convicted of any criminal offense "shall be *sentenced* in accordance with" chapters 7 (sentencing and imprisonment), 8 (restitution and fines), and 9 (probation) (emphasis added)); A.R.S. § 13-603(B) ("[T]he court . . . may suspend the imposition or execution of sentence and grant such person a period of probation except as otherwise provided by law. The *sentence* is tentative to the extent that it may be altered or revoked in accordance with chapter 9 of

this title, but for all other purposes it is a final judgment of conviction." (emphasis added)); A.R.S. § 13-603(E)(4) ("If a person is convicted of an offense and not granted a period of probation, or when probation is revoked, any of the following *sentences* may be imposed . . . . [including,] intensive probation, subject to the provisions of chapter 9 of this title." (emphasis added)). The statutes defining probation and intensive probation also refer to the imposition of both as a "sentence" in specific subsections. A.R.S. § 13-901(I) ("When granting probation, the court shall set forth at the time of sentencing and on the record the factual and legal reasons in support of each sentence."); A.R.S. § 13-914(D) ("When granting intensive probation the court shall set forth on the record the factual and legal reasons in support of the sentence.").

**¶28** This is not to say that *Muldoon's* pronouncement concerning the distinctions between probation and a sentence is no longer applicable; the fact remains that a court must suspend imposition or execution of a sentence to place a defendant on probation. *See* A.R.S. § 13-901(A); A.R.S. § 13-914(C). The cases and statutes cited above merely stand for the proposition that we must not cling to those distinctions when doing so would undermine clear expressions of the legislature or lead to absurd results. *Stambaugh v. Killian*, 242 Ariz. 508, 509, ¶ 7 (2017) (the primary goal of statutory interpretation "is to effectuate the legislature's intent"); *State ex rel. Montgomery v. Harris*, 237 Ariz. 98, 101, ¶ 13 (2014) ("Statutes should be construed sensibly to avoid reaching an absurd conclusion.").

**¶29** With these principles in hand, we turn to the meaning of the term "sentences" in A.R.S. § 13-116. Arizona courts have addressed claims concerning whether a consecutive term of probation violates A.R.S. § 13-116 for some time. *See, e.g.*, *State v. McDonagh*, 232 Ariz. 247, 248, ¶ 3 (App. 2013) ("Consistent with A.R.S. § 13-116, the probation grants were ordered to run concurrently."); *State v. Cornish*, 192 Ariz. 533, 538, ¶ 19 (App. 1998) (considering A.R.S. § 13-116 concerning a term of probation imposed consecutively to a prison sentence). Although these decisions did not directly address whether A.R.S. § 13-116 applies to a consecutive term of probation, we find them persuasive. Therefore, we conclude A.R.S. § 13-116 must encompass a consecutive term of probation for two reasons.

**¶30** First, both our supreme court and this court have recognized that the legislature intended A.R.S. § 13-116's protections to extend beyond the boundaries of a traditional criminal sentence. In *Anderjeski v. City Court of Mesa*, our supreme court held that A.R.S. § 13-116 applied not only to several defendants' potential sentences—i.e., the term of imprisonment and fines the court might impose upon conviction—but also to the "points"

assessed on the defendants' driving records according to the Motor Vehicle Department's administrative scheme. 135 Ariz. 549, 551 (1983). In so holding, the court concluded that A.R.S. § 13-116 expressed "clear legislative intent . . . not to cumulate *punishment* for one act." *Id.* (emphasis added); *see also McDonagh*, 232 Ariz. at 250, ¶ 14 (absent clear legislative intent overriding A.R.S. § 13-116's prohibition on cumulative punishment, "sentencing court may not impose cumulative punishment for a single act"); *State v. Sheaves*, 155 Ariz. 538, 540 (App. 1987) ("The legislature enacted § 13-116 to protect a defendant from the imposition of multiple punishment[s] . . . arising from the same factual situation."). Although probation is not generally considered a sentence, it has long been considered a punishment, albeit a "mild and ambulatory punishment . . . intended as a reforming discipline." *Korematsu v. United States*, 319 U.S. 432, 435 (1943) (quoting *Cooper v. United States*, 91 F.2d 195, 199 (5th Cir. 1937)); *see also State v. Heron*, 92 Ariz. 114, 115 (1962). We see no meaningful basis on which we could distinguish, for the purpose of interpreting A.R.S. § 13-116's reach, between the punishment inflicted by "points" on an individual's driving record and the imposition of probation.

**¶31** Second, interpreting A.R.S. § 13-116 to bar consecutive sentences, but not a consecutive term of probation imposed after multiple convictions for the same act, would lead to absurd results. As noted by the supreme court when discussing the nature of a probation grant in *Muldoon*, "[i]f the conditions [of probation] are performed, the court need not impose the sentence because the defendant has proven himself or herself worthy not to suffer such sentence." 159 Ariz. at 298. But if the conditions of probation are not performed, the court is authorized to impose a sentence. Ariz. R. Crim. P. 27.8(c)(2) ("If the court revokes probation, the court must pronounce sentence . . . ."). Yet, if the State's argument were correct, the revocation of the consecutive probation term would lead to the very sentence that A.R.S. § 13-116 would have barred if the court had imposed consecutive prison sentences originally. Interpreting the statute in this manner would yield an absurd result.

**¶32** Accordingly, we hold that despite the general principle that probation is not a sentence, A.R.S. § 13-116 must be interpreted to prohibit the court from imposing a consecutive term of probation when the conviction underlying it flows from the same act as a conviction resulting in a sentence of imprisonment. Therefore, the consecutive term of probation imposed for the fraudulent schemes and artifices conviction was an unlawful double punishment, and the case must be remanded for resentencing.

## CONCLUSION

¶33      We affirm Watson's convictions but vacate his sentences and remand for resentencing in accordance with this opinion.



AMY M. WOOD • Clerk of the Court
FILED:  AA