IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

STATE OF ARIZONA, *Appellee,*

*v.*

L&L INVESTMENTS LLC, *Appellant.*

No. 1 CA-CR 24-0501

FILED 02-20-2026

Appeal from the Superior Court in Maricopa County
No. CR2021-002107-017
The Honorable David W. Garbarino, Judge

**AFFIRMED**

COUNSEL

Arizona Attorney General's Office, Phoenix
By Celeste Kinney
*Counsel for Appellee*

Feldman & Royle, PLLC, Phoenix
By David E. Ahl
*Counsel for Appellant*

**OPINION**

Judge Andrew J. Becke delivered the opinion of the Court, in which Presiding Judge David B. Gass and Judge Michael J. Brown joined.

**B E C K E,** Judge:

¶1        Defendant L&L Investments LLC ("L&L") appeals its convictions and sentences for conspiracy, illegal control of an enterprise, theft, and fraudulent schemes and artifices. For the following reasons, we affirm.

## FACTUAL AND PROCEDURAL HISTORY[1]

¶2        Arizona's state Medicaid program, the Arizona Health Care Cost Containment System ("AHCCCS"), employs a "customer service practice" designed to expedite billing payments for Native American clients enrolled in its American Indian Health Program. Under this approach, AHCCCS does not require supporting documentation to verify reimbursement requests for services allegedly provided. In addition, an entity may "back bill" for up to six months before a client's admission to a treatment facility, without needing to submit corroborating documentation.

¶3        L&L, owned by Larry and Leasa Carter, operated behavioral health facilities in Nevada. Nevada's state Medicaid program sanctioned the Carters in 2014 and 2016 by placing them on its exclusion list and prohibiting them from operating any Medicaid-affiliated business for seven years. After Nevada's Medicaid program adopted stricter requirements for reimbursement payments, the Carters sought another state where they could continue their operations. They learned that AHCCCS functioned like "old Nevada," meaning it did not require prior authorization for services. L&L then began operating in Arizona, where it and its affiliates engaged in fraudulent billing practices. For instance, L&L would "back bill" for non-existent services to clients purportedly performed up to six months before they actually began treatment. L&L also requested reimbursement for services purportedly rendered to clients after the clients died.

¶4        Dale Henson worked closely with the Carters. Ariell Dix was another close affiliate of L&L. In Nevada, Henson's role involved billing for businesses under the L&L "umbrella." After L&L transitioned to Arizona, Dix, acting on L&L's behalf, instructed Henson to assist with billing in Arizona. Dix emailed Henson L&L's checklist—a guide outlining the steps a new provider must take to become AHCCCS-approved in Arizona. Before completing an AHCCCS enrollment application, L&L required each new

---

[1] We view the facts in the light most favorable to upholding the jury's verdicts and resolve all reasonable inferences against L&L. *State v. Watson*, 248 Ariz. 208, 211 n.1 (App. 2020).

service provider to enter into a contract with the company. Under these contracts, the service provider was required to grant L&L a 20 percent ownership stake in the business, entitling L&L to a corresponding share of its revenue.

¶5            To become an AHCCCS-approved service provider, an applicant must complete an enrollment application that includes signing a "provider participation agreement." The provider participation agreement requires the provider to disclose any related parties or individuals holding at least a 5 percent ownership interest. The provider must also report any adverse actions taken against it or its owners, such as sanctions from another state's Medicaid program or criminal charges. These disclosures are essential for AHCCCS to evaluate whether it should include the provider in its network.

¶6            Henson began assisting with L&L's Arizona operations in July 2019. Later that year, Henson learned that the Carters and Dix were on the Nevada program's exclusion list, which barred them from operating any Medicaid-affiliated business. Additionally, Dix had been criminally charged in Nevada in June 2019 with Medicaid fraud and for failing to maintain adequate records. The Carters became aware of Dix's criminal charges after she forwarded them an email from her attorney that included the criminal complaint and a supporting affidavit.

¶7            Over time, Henson helped establish about 30 businesses under the L&L umbrella. Several of those businesses failed to comply with mandatory disclosure requirements when submitting their enrollment applications in violation of their provider participation agreements with AHCCCS. The enrollment applications omitted information regarding L&L's and its agents' ownership interests and the agents' exclusions from Nevada's Medicaid program. Henson terminated his relationship with L&L and the Carters in July 2020.

¶8            In early 2020, AHCCCS's Office of Inspector General became aware of the fraudulent billing practices after receiving a client complaint. After an overnight stay in jail, the client had attempted to return to one facility but complained about being redirected to another. The Office discovered that this second facility was not registered with AHCCCS and later determined that additional behavioral health facilities affiliated with L&L had billed for services purportedly rendered to the client on the same day.

¶9         The Office began an investigation that later revealed L&L had received about $7,000,000 in AHCCCS payments from the businesses under its umbrella during 2019 and 2020.

¶10         In September 2021, a grand jury indicted L&L and 26 co-defendants, including Henson and Dix, on four counts: (1) conspiracy, (2) illegal control of an enterprise, (3) theft, and (4) fraudulent schemes and artifices. *See* A.R.S. §§ 13-1003(A), -1802(A)(3), -2310(A), and -2312(B).

¶11         In April 2023, Henson pled guilty to conspiracy, illegal control of an enterprise, and fraudulent schemes and artifices. Under the terms of his plea agreement, he agreed to testify truthfully against L&L.

¶12         On the first day of trial, the State filed a motion to admit evidence of Dix's Nevada criminal charges and exclusion from Nevada's program. The State claimed that Dix had purposely failed to disclose to AHCCCS her exclusion from Nevada's program as part of L&L's scheme to defraud AHCCCS. L&L did not object to the prosecutor referencing Dix's charges in the State's opening statement but asked the court to defer ruling on its admissibility until proper foundation had been laid. The court agreed. On the eighth day of trial, the State moved to admit the email from Dix to the Carters and its attachments. The court admitted the evidence over L&L's objection.

¶13         After the State rested its case in chief, L&L moved for a judgment of acquittal, arguing that the State had never identified L&L as a legal entity. The court denied the motion, finding that substantial evidence supported L&L's identity as the defendant.

¶14         The jury found L&L guilty on all four counts. The court imposed a $1,000,000 fine for each count. L&L timely appealed, and we have jurisdiction under Article 6, Section 9, of the Arizona Constitution, and A.R.S. §§ 12-120.21(A)(1), 13-4031, and 13-4033(A)(1).

## DISCUSSION

**I.    It Was Error to Admit the Inspector General's Expert Opinion Testimony, Including Testimony on an Ultimate Issue, but the Error Does Not Require Reversal.**

¶15         L&L argues that the superior court erred by allowing AHCCCS's Inspector General to testify that L&L participated in a "fraud scheme." L&L claims the testimony was an improper opinion on an ultimate issue in violation of Arizona Rule of Evidence 704.

¶16          L&L's ultimate issue argument is twofold: first, that the Inspector General was permitted to provide the jury with expert opinions despite testifying as a lay witness; and second, that those opinions impermissibly told the jury how to decide the case.

    *A. Although it was error to allow the Inspector General to offer expert opinions, it was not fundamental error.*

¶17          L&L first asserts that the Inspector General was not disclosed as an expert witness but testified as one. Commendably, the State conceded at oral argument before this court that the Inspector General offered expert testimony under Arizona Rule of Evidence 702 and we agree.

¶18          Arizona Rule of Criminal Procedure 15.1(b)(4)(A) requires the State to disclose the name, address, and qualifications of each expert it intends to call at trial. The State must also provide any report prepared by the expert or a summary of the general subject matter and opinions on which the expert is expected to testify. Ariz. R. Crim. P. 15.1(b)(4)(B)–(C).

¶19          The State's disclosure listed the Inspector General as a witness but did not identify her as an expert or disclose her qualifications. Instead, the disclosure merely incorporated its general witness list—containing more than 150 names—under the expert witness section, stating "See Rule 15.1(b)(1) List of Witnesses, *supra*." No other disclosure of the Inspector General's opinions or qualifications was provided.

¶20          In the preliminary instructions, the superior court instructed the jury on expert witness testimony. During the discussion of final jury instructions, however, the court asked whether the Inspector General was an expert witness. The prosecutor responded, "I don't think we noticed her as an expert witness," at which point the court removed the State's proposed expert witness instruction from the final jury instructions. On appeal, the State concedes the Inspector General was not disclosed as an expert.

¶21          The Arizona Rules of Evidence contemplate two mutually-exclusive types of opinion evidence: (1) lay opinion, and (2) expert opinion. Under Rule 701, a lay witness may only offer an opinion that is: (a) rationally based on the witness's perception; (b) helpful to understanding their testimony or determining a fact; and (c) not based on scientific, technical, or specialized knowledge within the scope of Rule 702.

**¶22**      Rule 702 governs expert witness opinions, providing that a witness "qualified as an expert by knowledge, skill, experience, training, or education" may offer opinions when "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or determine a fact in issue."

**¶23**      The Inspector General testified as an expert, not a lay witness. She based her testimony on her technical and specialized knowledge. She testified that she worked with AHCCCS since 2011 and investigated fraud with the Office of Inspector General for her entire tenure. She provided significant and detailed testimony regarding AHCCCS's operations and procedures—matters well outside the "experience or knowledge of the average juror." *See State v. Speers*, 209 Ariz. 125, 129, ¶ 14 (App. 2004).

**¶24**      Although the Inspector General offered a number of opinions based on her technical and specialized knowledge, L&L failed to object to any of that testimony based on lack of disclosure or Rules 701 and 702. That failure waives its arguments about the expert testimony absent fundamental error. *State v. Robles*, 182 Ariz. 268, 273 (App. 1995). "A defendant establishes fundamental error by showing that (1) the error went to the foundation of the case, (2) the error took from the defendant a right essential to his defense, *or* (3) the error was so egregious that he could not possibly have received a fair trial." *State v. Escalante*, 245 Ariz. 135, 142, ¶ 21 (2018) (emphasis in original). If either of the first two alternatives are shown, the defendant must further show resulting prejudice; for the third, prejudice is presumed. *Id.*

**¶25**      Although the State is required by rule to provide disclosure of expected expert witness testimony, L&L does not argue that the State's failure to do so here was fundamental error. Nor does L&L suggest that it was prejudiced by the State's lack of disclosure.

**¶26**      Instead, L&L argues that the lack of an expert witness instruction was fundamental error because "the jurors were unaware they could reject [the Inspector General's] testimony." But the court provided that instruction to the jury in the preliminary instructions. And when a trial court gives an expert witness instruction in preliminary instructions, but fails to repeat it in final instructions, the error is unlikely to be fundamental barring "extenuating circumstances" which are not present here. *See State v. Alvarez*, 205 Ariz. 110, 112, ¶ 3 (App. 2003) ("[T]he trial court's omission of those instructions . . . did not approach the level of fundamental error.").

¶27        Neither the superior court's admission of the Inspector General's expert testimony nor its failure to instruct the jury on expert witness testimony during the final instructions was fundamental error. Allowing the Inspector General to offer opinions based on her expertise, however, exacerbated the harm caused by her improper opinion on the ultimate issue, discussed below.

   B. *The Inspector General's testimony on the fraud scheme impermissibly addressed the ultimate issue.*

¶28        L&L next asserts that the Inspector General's testimony was conclusory, commenting on L&L's guilt and effectively telling the jury how to decide the case. We agree.

¶29        During direct examination, the State asked the Inspector General, "In this case or your investigation, it's your position that you uncovered a fraud scheme here?" The Inspector General answered affirmatively. L&L's counsel objected, arguing that the question called for a legal conclusion. The court overruled the objection.

¶30        Evidence Rule 704(a) states that "[a]n opinion is not objectionable just because it embraces an ultimate issue." The comment to the rule cautions, however, that "[s]ome opinions on ultimate issues will be rejected as failing to meet the requirement that they assist the trier of fact to understand the evidence or to determine a fact in issue." Ariz. R. Evid. 704 cmt. to original 1977 rule. As the comment emphasizes, "[w]itnesses are not permitted as experts on how juries should decide cases." *Id.*

¶31        In *Fuenning v. Superior Court*, 139 Ariz. 590 (1983), our supreme court explained, "ordinarily it would be neither necessary nor advisable" to ask a witness whether they think a defendant committed a crime with which he was charged. *Id.* at 605. The *Fuenning* Court noted that, when a law enforcement officer is asked if a defendant was driving while intoxicated, that officer is being asked for an opinion on guilt. *Id.* A proper question would ask whether the witness was familiar with the symptoms of intoxication and whether the defendant displayed them. *Id.* Testimony that "parrots" statutory language crosses the line between a permissible opinion that "embraces" an issue of ultimate fact and an improper opinion on guilt.[2] *Id.*; *State v. Williams*, 133 Ariz. 220, 228 (1982) ("[G]enerally a

---

[2] This language in *Fuenning* is dicta. *See State v. Carreon*, 151 Ariz. 615, 617 (App. 1986). Nevertheless, the *Fuenning* Court specifically cautioned

witness may not indicate his belief in defendant's guilt."); *see also State v. Herrera*, 203 Ariz. 131, 135, ¶ 7 (App. 2002) ("When a law enforcement officer in a DUI case parrots the language of A.R.S. § 28–1381(A)(1), he or she is essentially giving an opinion that the defendant is guilty.").

**¶32** Federal Rule of Evidence 704(a) is identical to the Arizona rule, so authorities interpreting the federal rule are persuasive.[3] *State v. Salazar-Mercado*, 234 Ariz. 590, 592–93, ¶ 7 (2014). The federal authorities are similarly antagonistic to this kind of opinion testimony. *United States v. Scop*, 846 F.2d 135, 142 (2d Cir. 1988) (reversing fraud convictions where an SEC investigator repeatedly used "statutory and regulatory language indicating guilt"); *Snap-Drape, Inc. v. Comm'r*, 98 F.3d 194, 198 (5th Cir. 1996) (noting that Rule 704(a) "does not allow an expert to render conclusions of law"); *Torres v. County of Oakland*, 758 F.2d 147, 151 (6th Cir. 1985) (finding error where an expert testified as to a legal conclusion); *RLJCS Enters., Inc. v. Pro. Benefit Tr. Multiple Emp. Welfare Benefit Plan & Tr.*, 487 F.3d 494, 498 (7th Cir. 2007) (upholding exclusion of expert opinions because "they conveyed legal rather than 'expert' opinions"); *United States v. Farrell*, 563 F.3d 364, 377 (8th Cir. 2009) (finding error where an expert's testimony "was not simply a factual conclusion but rather an attempt to express an opinion as to the guilt" of the defendants); *United States v. Simpson*, 7 F.3d 186, 188 (10th Cir. 1993) (noting that Rule 704(a) does not "allow an expert to offer testimony that merely tells the jury what result they should reach").

**¶33** Because this type of testimony "states a legal conclusion, usurps the function of the jury in deciding the facts, or interferes with the function of the judge in instructing the jury on the law," it remains impermissible despite the language of Rule 704(a). *Simpson*, 7 F.3d at 188. Opinions of this kind are inadmissible when they fail to assist the trier of fact or tell a jury how to decide the case. *See* Ariz. R. Evid. 704 cmt. to original 1977 rule; *Webb v. Omni Block, Inc.*, 216 Ariz. 349, 353, ¶ 14 (App. 2007) ("Such testimony is inadmissible because it provides no information to the trier of fact except what the verdict should read."); *Scop*, 846 F.2d at

---

against admitting just this kind of opinion evidence. *See State v. Bojorquez*, 145 Ariz. 501, 503 (App. 1985).

[3] Federal Rule of Evidence 704 was reworded in 2011 as part of a broader restyling of the rules. *See* Fed. R. Evid. 704 advisory committee's note to 2011 amendment. Although the wording changed, the changes were "stylistic only" and not intended to "change any result in any ruling on evidence admissibility." *Id.* Arizona adopted an identical change to Arizona Rule of Evidence 704 in 2012. *See* Ariz. R. Evid. 704 cmt. to 2012 amendment.

140 (holding that the expert did not couch his opinion in factual statements but "drew directly upon the language of the [fraud] statute").

¶34        Arizona law makes it unlawful, under "a scheme or artifice to defraud," for a person to knowingly obtain "any benefit by means of false or fraudulent pretenses, representations, promises or material omissions." A.R.S. § 13-2310(A).

¶35        The State improperly asked the Inspector General whether, in her opinion, her investigation of L&L had uncovered a "fraud scheme." The State sought to justify the question by noting that the Inspector General's opinion was based on her investigation. Indeed, in overruling L&L's objection, the superior court found the testimony admissible largely because, based on her training and experience, the Inspector General's "sole purpose" or "duty is to find fraud." But the fact that the Inspector General is tasked with finding and investigating fraud cuts against the admissibility of this testimony, not in favor of it. Law enforcement officers are not experts on whether a defendant is guilty, nor should they be permitted to testify as such.

¶36        Though a lay witness may offer an opinion on the ultimate issue if it is a reasonable inference based on her firsthand knowledge and perceptions, *see State v. Peltz*, 242 Ariz. 23, 29, ¶ 17 (App. 2017) (citation omitted), the Inspector General based her conclusion on reviewing documents and then employing her significant expertise in interpreting those documents. She did not observe the events or document them firsthand. *See Torres*, 758 F.2d at 149–50 (holding that lay opinions are helpful when the witness has "observed" the situation firsthand). And she admittedly provided opinion testimony as an expert under Rule 702, not as a lay witness under Rule 701. By affirming that she uncovered a "fraud scheme," she parroted the statutory language of A.R.S. § 13-2310(A) and told the jury how to decide the case. The court therefore abused its discretion by allowing the Inspector General to testify in a way that opined on L&L's guilt.[4]

---

[4] Because admission of this evidence was error, we do not separately analyze L&L's argument that the testimony's probative value was substantially outweighed by a danger of unfair prejudice under Rule 403.

*C. The admission of the Inspector General's opinion on guilt was harmless error.*

**¶37**        We will not reverse a conviction for error in admitting evidence over a timely and specific objection, if the court's error was harmless. *See State v. Leteve*, 237 Ariz. 516, 524, ¶ 25 (2015). "In essence, the state must demonstrate that even with the error, no reasonable jury could have found that the state failed to prove its case beyond a reasonable doubt." *State v. Brown*, __ Ariz. __, __, ¶ 52, 577 P.3d 14, 25 (2025).

**¶38**        The Inspector General's improper expert opinion testimony consisted of a single question and answer in an 11-day trial. Henson—who was an accomplice in L&L's fraudulent scheme and through whom much of the voluminous documentary evidence was admitted—testified against the Carters and L&L over a four-day span, providing detailed and damning evidence of L&L's guilt. The court also instructed the jury on credibility and the limited weight of law-enforcement testimony, emphasizing that the jury could accept all, part, or none of any witness's testimony.

**¶39**        Given the brevity of the Inspector General's improper expert opinion contrasted with the weight of the other evidence presented, the State has met its burden of showing that, beyond a reasonable doubt, the Inspector General's opinion did not influence the jury's verdict. *See Brown*, __ Ariz. at __, ¶ 52 ("An error is harmless if the state proves beyond a reasonable doubt that the error had no influence on the jury's judgment.").

## II.     The Superior Court Properly Admitted Nevada's Criminal Complaint and Supporting Affidavit Against Dix.

**¶40**        L&L argues the superior court erred when it admitted the email from Dix to the Carters—including Dix's Nevada criminal complaint and its supporting affidavit—over Rule 404(b) and 403 objections. We disagree.

**¶41**        Because L&L objected at trial, we review the superior court's decision to admit other-acts evidence for an abuse of discretion. *State v. Hulsey*, 243 Ariz. 367, 381, ¶ 38 (2018).

**¶42**        Evidence Rule 404(b)(1) provides that "evidence of other crimes, wrongs, or acts is not admissible to prove" a person's character or conformity with the charged crime. Such evidence may be admissible, however, when offered to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Ariz. R. Evid. 404(b)(2). Under Rule 403, the court may exclude relevant evidence "if its

probative value is substantially outweighed by a danger" of, among other things, unfair prejudice, confusing the issues, or misleading the jury.

**¶43** In *State v. Ritacca*, 169 Ariz. 401, 402–03 (App. 1991), we held that evidence of a defendant's other acts was admissible over a Rule 404 objection to prove a material omission, an element of fraudulent schemes and artifices. There, the defendant misrepresented his experience to victims who, had they known his criminal history, would not have entrusted him with their money. *Id.* at 402. The *Ritacca* Court concluded that the evidence was not character evidence, but rather admissible to show a material omission. *Id.* at 402–03.

**¶44** The same is true here. AHCCCS requires new providers to submit enrollment applications disclosing ownership interests and any adverse actions against those individuals. L&L's agent, Leasa Carter, failed to disclose her ownership interests in multiple applications and omitted her exclusion from Nevada's program. By concealing essential ownership and exclusion information, L&L's agent made material omissions and misrepresentations to AHCCCS.

**¶45** The email regarding Dix's Nevada criminal charges was similarly relevant to show material omissions. The superior court found that the information regarding Dix's criminal charges was "highly probative in terms of what the folks at L&L knew or should have known." L&L and its agents knew that Dix's legal issues were significant and would be relevant to AHCCCS's evaluation of L&L's applications. The court properly determined that the email and its attachments were probative as to L&L's knowledge and that their probative value was not substantially outweighed by any danger of unfair prejudice, confusing the issues, or misleading the jury.

**¶46** The superior court's admission of the email, Dix's Nevada criminal complaint, and the supporting affidavit was therefore proper and not an abuse of discretion.

**III.** **Under the *Gordon* Test, the Superior Court Properly Imposed Consecutive Fines for Separate Offenses.**

**¶47** L&L was convicted of fraudulent schemes and artifices, conspiracy, illegal control of an enterprise, and theft. During sentencing, the court determined that L&L committed numerous criminal acts between January 2019 and October 2020, and imposed a $1,000,000 fine for each count, totaling $4,000,000 under A.R.S. § 13-803(A)(1). L&L argues the

superior court improperly imposed separate $1,000,000 fines on each of the four counts. We disagree.

¶48 Under A.R.S. § 13-116, "[a]n act or omission which is made punishable in different ways by different sections of the laws may be punished under both, but in no event may sentences be other than concurrent." We review a superior court's decision to impose consecutive sentences under A.R.S. § 13-116 *de novo. State v. Cotten*, 228 Ariz. 105, 108, ¶ 8 (App. 2011). A fine is a "criminal penalty" constituting a "sentence" subject to A.R.S. § 13-116 requirements. *State v. McDonagh*, 232 Ariz. 247, 249, ¶ 9 (App. 2013) (internal quotations omitted). As used here, a consecutive fine means "requiring full payment, *without* credit, for each count . . . rather than 'concurrently' (by requiring full payment, *with* credit, for each count . . .)." *Id.* at 251, ¶ 17 (emphasis added).

¶49 Arizona courts apply a three-part test to determine whether the evidence shows a single act (or omission) or multiple acts (or omissions) under A.R.S. § 13-116. *See State v. Gordon*, 161 Ariz. 308, 315 (1989). First, we subtract "the evidence necessary to convict on the ultimate charge-the one that is at the essence of the factual nexus and that will often be the most serious of the charges" and determine whether "the remaining evidence satisfies the elements of the other crime[s]." *Id.* Second, we consider whether "it was factually impossible to commit the ultimate crime without also committing the secondary crime[s]." *Id.* "If so, then the likelihood will increase that the defendant committed a single act" subject only to concurrent sentences. *Id.* Third, we consider whether the defendant's conduct caused the victim to suffer "an additional risk of harm beyond that inherent in the ultimate charge." *Id.* If the victim suffered additional harm, then "ordinarily the court should find that the defendant committed multiple acts and should receive consecutive sentences." *Id.*

¶50 The "ultimate charge" here was fraudulent schemes and artifices. The fraudulent schemes and artifices charge was "at the essence of the factual nexus" and the most serious: a class 2 felony. To prove fraudulent schemes and artifices, the State needed to show that L&L, "pursuant to a scheme . . . to defraud, knowingly obtain[ed] any benefit" through "false or fraudulent pretenses, representations, promises or material omissions." A.R.S. § 13-2310(A).

¶51 First, under the *Gordon* test, if the evidence supporting L&L's conviction for fraudulent schemes and artifices were set aside, sufficient evidence would remain to uphold L&L's other convictions. *See Gordon*, 161 Ariz. at 315.

¶52        L&L participated in a scheme to defraud through material omissions. A fraud scheme occurred whenever L&L or one of its agents sent an enrollment application to AHCCCS, and it was approved. L&L did not need to receive funds for the fraud to be complete because a scheme occurred when L&L obtained "*any* benefit." A.R.S. § 13-2310(A) (emphasis added). L&L received a benefit when AHCCCS approved the providers, in which the L&L umbrella had an ownership interest, to provide services and bill clients. *Cf. State v. Johnson*, 179 Ariz. 375, 379 (1994) ("Defendant arguably received two different benefits. The first was the cards that allowed Defendant to obtain the gas, and the second was the gas itself.").

¶53        A person commits conspiracy by intending to promote or assist a crime, agreeing with others to commit it, and when any party takes an overt act to further that crime. A.R.S. § 13-1003(A). Setting aside the evidence necessary to prove fraudulent schemes and artifices — L&L's material omission of ownership information from AHCCCS applications to obtain the ability to bill AHCCCS — ample evidence remains to show conspiracy. L&L agreed with its affiliated businesses to bill AHCCCS multiple times for services provided only once. Each of those bills was a forgery, *i.e.*, an "instrument . . . that contains false information." A.R.S. § 13-2002(A)(3).

¶54        Illegal control of an enterprise occurs when a person is employed by or associated with an enterprise and conducts its affairs through racketeering, or participates, directly or indirectly, in the conduct of an enterprise that they know is being conducted through racketeering. A.R.S. § 13-2312(B). Here, Leasa Carter, through L&L, orchestrated a scheme in which L&L's affiliated businesses illegally billed AHCCCS for services that were not provided or billed AHCCCS multiple times for services provided only once. By using her ownership and managerial positions to further and conceal the scheme, Carter participated in the operation and management of enterprises engaged in racketeering activity. Thus, her conduct was associated with L&L, she participated in its affairs, and she knew L&L was being operated through fraudulent practices constituting racketeering. This evidence was sufficient to convict without considering the fraudulent schemes and artifices evidence.

¶55        Theft occurs when a person, without lawful authority, knowingly obtains another's property or services through a material misrepresentation and intends to deprive the person of that property or those services. A.R.S. § 13-1802(A)(3). L&L obtained AHCCCS reimbursements through its affiliated providers' fraudulent billing practices. On numerous occasions, L&L entities billed AHCCCS for services

that never occurred, including purported services to deceased individuals. The resulting reimbursements were property obtained without lawful authority and with the intent to secure financial benefit for L&L. Accordingly, L&L's billing and reimbursement practices satisfy the elements of theft without consideration of the evidence necessary to satisfy the fraudulent schemes and artifices conviction.

¶56 Second, under *Gordon*, it was factually possible for L&L to commit fraudulent schemes and artifices without committing conspiracy, illegal control of an enterprise, and theft. *See* 161 Ariz. at 315. L&L materially omitted ownership information from its affiliates' applications to AHCCCS. As discussed above, the ability to bill AHCCCS was, in and of itself, a benefit to L&L. Even if L&L had gone no further than submitting the applications, a crime was committed. This factor supports that there were multiple acts subject to consecutive sentences as opposed to a single act subject to concurrent sentences.

¶57 Third, under *Gordon*, L&L's conduct caused harm beyond the initial benefit it obtained from having its affiliated businesses approved as AHCCCS providers through fraudulent schemes. *See* 161 Ariz. at 315. After securing provider status, L&L's ongoing practices resulted in additional financial harm to AHCCCS by paying fraudulent bills and harm to patients. The Office of Inspector General investigated a complaint about patient care and found one of L&L's behavioral health facilities operating without AHCCCS registration, placing the patient at risk and resulting in overbilling. Thus, L&L's misconduct extended beyond the fraudulent acquisition of provider approval to encompass continued financial and operational harm. Because of this additional harm, we "should find that the defendant committed multiple acts and should receive consecutive sentences." *Id.*

¶58 Considering these factors together, we conclude that L&L's misconduct involving conspiracy, illegal control of an enterprise, theft, and fraudulent schemes and artifices constituted separate criminal acts under *Gordon*. Therefore, the superior court's imposition of a $1,000,000 fine for each of L&L's convictions did not violate A.R.S. § 13-116.

## IV. The Prosecutor's Comments During Closing Arguments Do Not Constitute Fundamental Error.

¶59 L&L argues that several of the prosecutor's comments during closing arguments were prosecutorial error, and that the error's cumulative effect warrants reversal. We disagree.

**¶60**   L&L did not object to the purported error during trial. We therefore review its claims for fundamental error. *See State v. Robinson*, 253 Ariz. 121, 142, ¶ 64 (2022). We first examine each alleged instance for error, then consider whether the cumulative effect deprived L&L of a fair trial and denied it due process. *See id.* at 143, ¶ 64.

   A. *The prosecutor's personal opinion about the evidence was improper, but it was not fundamental error.*

**¶61**   L&L asserts that the prosecutor engaged in improper vouching by expressing a personal opinion about the evidence when he stated that L&L was not engaged in any legitimate business activity.

**¶62**   During closing arguments, the prosecutor said:

> I think that . . . in a case with this much evidence I think it's helpful to just clarify what the evidence suggests. And not even suggest, but shows. And here at least the evidence, from my perspective, shows that there is nothing legitimate going on in Arizona under the L&L umbrella.

**¶63**   Our supreme court has recognized two types of prosecutorial vouching: (1) when a prosecutor places the prestige of the government behind a witness; and (2) when a prosecutor suggests that information not before the jury supports the witness's testimony. *State v. Johnson*, 247 Ariz. 166, 204, ¶ 157 (2019) (citation omitted). A form of the second type of vouching occurs where a prosecutor offers an opinion about the defendant's guilt.

**¶64**   It is improper for a prosecutor to express a personal opinion regarding the defendant's guilt. *State v. Van Den Berg*, 164 Ariz. 192, 196 (App. 1990) ("It is improper and unethical for an attorney in his closing argument to express his personal opinion as to a defendant's guilt or innocence."); ER 3.4(e) ("A lawyer shall not . . . state a personal opinion as to . . . the guilt or innocence of an accused."); *see also U.S. v. Young*, 470 U.S. 1, 18–19 (1985) ("[T]he prosecutor's opinion carries with it the imprimatur of the Government and may induce the jury to trust the Government's judgment rather than its own view of the evidence.").

**¶65**   In *State v. Acuna Valenzuela*, our supreme court considered whether a prosecutor's use of "we know" statements regarding the evidence "inappropriately related her personal opinion of [the defendant's] guilt." 245 Ariz. 197, 218, ¶¶ 83–85 (2018). The prosecutor in *Acuna Valenzuela* stated, "[w]e know that the defendant had gunshot residue on

him not just because he has bad luck, but because he's the one that used the gun to cause all of this damage," and "[w]e know the defendant attempted to shoot and kill [the victim]." *Id.* at ¶ 83. The court held that because the prosecutor "[did] not use 'I' or 'me' to indicate what her personal view of the case was to the jury . . . the prosecutor did not impermissibly express her personal opinion." *Id.* at ¶ 84. But the court "caution[ed] prosecutors to refrain from using 'we know' and similar phrases to suggest that their argument bears the imprimatur of the state." *Id.* at ¶ 85.

¶66        Unlike the use of "we know" in *Acuna Valenzuela*, the prosecutor here used the term "my perspective" to express his personal opinion on the legitimacy of L&L's business, arguably a comment on L&L's guilt. However, "even with these improper comments, the jury's verdict must have been improperly influenced by the statements." *Id.* at 217, ¶ 73. Here, the court instructed the jury that attorneys' arguments were not evidence. We presume that the jury followed the court's instructions. *See State v. Newell*, 212 Ariz. 389, 403, ¶ 68 (2006). Given that only a single improper comment was made, L&L has not shown fundamental error. *See Van Den Berg*, 164 Ariz. at 196 ("Because [the prosecutor's expression of his opinion on the defendant's guilt] was a solitary comment with no objection, and the jury was instructed that attorneys' opinions were not evidence, no fundamental error . . . occurred.").

   *B.   The prosecutor's comment on why Henson pled guilty was a reasonable inference based on admitted evidence.*

¶67        According to L&L, the prosecutor improperly stated why Henson pled guilty, thereby referring to information not contained in the record.

¶68        During closing arguments, the prosecutor stated:

   And in this particular case, or in this trial it has been shown over and over and over again that [] Henson misled AHCCCS in terms of overbilling them according to the billing matrices as delivered to him. He claims it's [Dix]'s or L&L's matrices. I think it's his as well. I don't think [he] gets out of that, and so that's why he pled guilty to fraud[] schemes, and conspiracy to commit fraud schemes.

¶69        Although Henson did not testify about his plea agreement with the State, he testified about his federal plea agreement. On direct examination, Henson explained that he faced a 10-year sentence if convicted at trial or a two-year sentence if he pled guilty. During cross-

examination, L&L's counsel revisited the topic, emphasizing that Henson sought to avoid prison by testifying.

¶70        Given this record, the prosecutor's comment about why Henson pled guilty was a reasonable inference drawn from admitted evidence. *See State v. Crain*, 250 Ariz. 387, 399, ¶ 44 (App. 2021). The prosecutor's argument also fell within the "wide latitude" permitted in closing arguments. *See State v. Zaragoza*, 135 Ariz. 63, 68 (1983). Moreover, the court instructed the jury that attorneys' arguments were not evidence, and we presume that the jury followed those instructions. *See Newell*, 212 Ariz. at 403, ¶ 68; *see also State v. Vargas*, 251 Ariz. 157, 178, ¶ 76 (App. 2021) ("[A]rguments made by counsel generally carry less weight than instructions from the court."). The prosecutor's comments on Henson's guilty plea were not improper.

    *C. Evidence in the record supports the prosecutor's reference to Dix's exclusion from Nevada's program and conviction.*

¶71        L&L also asserts that the prosecutor improperly alleged that L&L and Dix failed to disclose Dix's criminal case and her exclusion from Nevada Medicaid to AHCCCS. L&L contends that, because the prosecutor provided no evidence of such nondisclosure, his comments referred to facts outside the record.

¶72        As discussed above, however, the record contains evidence that L&L did not disclose Dix's exclusion and conviction in multiple AHCCCS enrollment applications, in violation of their provider participation agreements with AHCCCS. Because this evidence was admitted at trial, the prosecutor's reference was based on the record. Accordingly, the prosecutor did not err.

    *D. L&L has not established cumulative error requiring reversal.*

¶73        L&L asserts that the cumulative effect of prosecutorial error deprived it of a fair trial and due process. We disagree. In addressing the cumulative effect of prosecutorial error, our supreme court has stated:

> Even if there is no error or an error is harmless and so by itself does not warrant reversal, an incident may nonetheless contribute to a finding of persistent and pervasive misconduct if the cumulative effect of the incidents shows that the prosecutor intentionally engaged in improper conduct and did so with indifference, if not a specific intent, to prejudice the defendant.

*State v. Morris*, 215 Ariz. 324, 335, ¶ 47 (2007) (quoting *State v. Roque*, 213 Ariz. 193, 228, ¶ 155 (2006)) (cleaned up).

**¶74**        Because L&L has described only one instance of prosecutorial error, this is not the sort of "persistent and pervasive" conduct that would warrant reversal. *See id.* at 339, ¶ 67. We therefore conclude that the prosecutor's conduct did not deprive L&L of a fair trial.

## V.        Substantial Evidence Supports L&L's Identity as a Legal Entity.

**¶75**        L&L argues that the superior court erred by denying its motion for judgment of acquittal, claiming that the State failed to prove its identity. We disagree.

**¶76**        We review the denial of a motion for judgment of acquittal *de novo*, viewing the facts in the light most favorable to sustaining the verdicts and resolving evidentiary conflicts against L&L. *See State v. Andersen*, 255 Ariz. 320, 323, ¶ 7 (App. 2023). "When reasonable minds may differ on inferences drawn from the facts, the case must be submitted to the jury, and the [superior court] has no discretion to enter a judgment of acquittal." *State v. Lee*, 189 Ariz. 590, 603 (1997).

**¶77**        The record contains substantial evidence identifying L&L as the defendant. Witnesses—including Henson, who worked within L&L— testified that the Carters and Dix operated under the business name "L&L Investments." Henson stated that the Carters controlled all aspects of L&L and that all decisions went through them. He identified L&L's email address, "landlinvestments2016@gmail.com," as the same one the Carters used. The Carters owned and operated L&L, and Dix served as a high-managerial employee. *See* A.R.S. § 13-305(A)(2).

**¶78**        L&L asserts that the State failed to present formal documentation, such as articles of organization, to prove its existence as a legal entity. But L&L's counsel conceded that the State did not need to produce such documents to establish identity. Arizona law defines a "person" to include an "enterprise, . . . an unincorporated association, a partnership, . . . or entity capable of holding a legal or beneficial interest in property." A.R.S. § 13-105(30).

**¶79**        As shown at trial, L&L obtained ownership interests in various providers through its agents, particularly Leasa Carter, who signed consultant agreements identifying herself as "Leasa Carter (L & L Investments)." Because substantial evidence supported a finding that L&L

functioned as a legal entity, the superior court properly denied its motion for judgment of acquittal.

## CONCLUSION

¶80         We affirm L&L's convictions and sentences.



MATTHEW J. MARTIN • Clerk of the Court
**FILED**:          JR